**WICHITA GAS CO. v. PUBLIC SERVICE COMMISSION OF KANSAS et al., and nine other cases.**

Nos. 1637–N to 1646–N.

District Court, D. of Kansas, First Division.
Jan. 5, 1933.

Dissenting Opinion Jan. 14, 1933.

Supplemental Memorandum Jan. 16, 1933.

James W. Finley and R. E. Cullison, both of Bartlesville, Okl., Chas. A. Frueauff and Robt. S. Sloan, both of New York City, Fred Robertson and J. O. Emerson, both of Kansas City, Kan., Robt. D. Garver, of Kansas City, Mo., and Robt. Stone, of Topeka, Kan., for plaintiffs.

Chas. D. Welch, of Coffeyville, Kan., Harry Castor, of Wichita, Kan., and Chas. W. Steiger and E. H. Hatcher, both of Topeka, Kan., for defendants.

Before PHILLIPS and McDERMOTT, Circuit Judges, and HOPKINS, District Judge.

PHILLIPS, Circuit Judge.

The Cities Service Gas Company, a Delaware corporation, is engaged in the business of producing and transporting gas from Texas and Oklahoma and delivering it to distributing companies along its line, among which are the following in the state of Kansas: The Wichita Gas Company, the Hutchinson Gas Company, the Pittsburg Gas Company, the Capital Gas & Electric Company, the Newton Gas Company, the Girard Gas Company, the Wyandotte County Gas Company, the Union Public Service Company, and the Western Distributing Company.

The common stock of each of such distributing companies, except the qualifying directors' shares, is owned by the Gas Service Company, a corporation. The stock of the Gas Service Company, except the qualifying directors' shares, is owned by the Cities Service Company, a Delaware corporation. The stock of the Cities Service Gas Company, except the qualifying directors' shares, is owned by the Empire Gas & Fuel Company. The stock of the Empire Gas & Fuel Company, except the qualifying directors' shares, is owned by the Cities Service Company.

The Western Distributing Company is a West Virginia corporation and a citizen of that state. The Union Public Service Company is a Delaware corporation and a citizen of that state. The other distributing companies are Kansas corporations.

The Cities Service Gas Company furnishes gas to the distributing companies at the city gates under day to day contracts, which are oral, at 40 cents per thousand cubic feet. Each of the distributing companies has contracted to pay Henry L. Doherty & Company 1¾ per cent. of the gross revenue, a per diem charge and expenses for certain specific services, and an engineering fee of 5 per cent. of the cost of new construction, in consideration of which Henry L. Doherty & Company maintains legal, managerial, engineering, accounting, and purchasing staffs whose services are available to the distributing companies.

Each of the distributing companies has also entered into a contract with the Gas Service Company under which the latter furnishes and the former pays for certain services. This contract has been approved by the commission and is not in controversy here.

On July 2, 1931, the Public Service Commission commenced a proceeding against the corporations hereinbefore named, except the Cities Service Company and the Cities Service Gas Company. It found that the reasonableness of the contracts hereinbefore referred to, and the charges made for services and commodities furnished thereunder, should be inquired into and a determination made of the amounts which properly should be set up as operating expense of the distributing companies on account of expenditures made for such commodities and services under such contracts, and entered an order on such findings for a hearing to inquire into the reasonableness of such contracts and charges, and directed that respondents in such proceeding furnish such information concerning such contracts as the commission might desire, and "show cause why such holding

company contracts, or service or commodity charges, should they be found to be unreasonable, should not be disallowed as operating expense of the distributing companies, and adjustment made in this respect as to charges made to the consumers."

After a hearing, the commission on July 20, 1932, made findings to the effect that any amounts paid by the distributing companies under their contracts with Henry L. Doherty & Company were unreasonable, and that any amounts paid by the distributing companies to the Cities Service Gas Company for gas in excess of 29.5 cents per thousand cubic feet at the city gates were unreasonable, and ordered that on and after August 1, 1932, the distributing companies (1) cease setting up on their books as operating expenses the 1¾ per cent. payments to Henry L. Doherty & Company and any payments for gas to the Cities Service Gas Company in excess of 29.5 cents per thousand cubic feet, (2) give no consideration to any such payments in fixing their rates to domestic consumers, (3) reduce their rates to their consumers proportionately, pending a final determination of their rates; and show cause on September 1, 1932, why such reduction should not be made permanent.

A petition for rehearing was filed by the respondents setting up 51 grounds. A rehearing limited to one of such grounds was granted. After such rehearing, the commission increased its finding of a reasonable charge for gas at the city gates from 29.5 to 30 cents, and with that modification and the necessary changes in dates, on August 31, 1932, re-entered its order of July 20 in the form of two orders.

The material portions of the first of such orders is as follows:

"That on and after the 1st day of September, 1932, the distributing companies, respondents above named, shall cease to set up on their books as an expense item any payments made to Henry L. Doherty & Company under the contract above mentioned, because of the one and three-fourths per cent. charge and also any payments made to Cities Service Gas Company for main line town border gas in excess of 30 cents per M. C. F., and should give no consideration to any such payments in fixing a rate for the domestic consumer.

"That on the 17th day of October, 1932, the distributing companies, respondents above named, appear before the Public Service Commission, at 10:00 o'clock a. m., and show cause to the commission why the reduction in expenses as above set forth should not be passed on to the consumers with such other reductions as may be found reasonable."

The material portions of the second of such orders is as follows:

"It is therefore by the commission ordered, that effective September 1, 1932, and until a hearing is held and an order issued, that the distributing companies, respondents above named, shall charge rates to the consumers as follows:

"All distributing companies paying a gate rate in excess of 30 cents per M. C. F. shall deduct the difference between what the distributing company is now paying at the city gate and 30 cents per M. C. F. and pass on this difference to the consumer."

The nine distributing companies and the Cities Service Gas Company brought separate suits in equity to enjoin the enforcement of the two orders of August 31, 1932.

The Newton Gas Company filed a cross-bill in each of the suits brought by the distributing companies in which it challenged the right of the commission to join it with the other utilities in one joint proceeding. Counsel for the Newton Gas Company have advised the court that they do not desire to press these cross-bills.

These actions were commenced on September 19, 1932, within the thirty-day period required by section 66—118, R. S. Kan. 1923.

The several bills alleged diversity of citizenship as to the Cities Service Gas Company, the Western Distributing Company and the Union Public Service Company, and alleged that the orders are confiscatory of plaintiffs' property, impair the obligations of their contracts, deny to them the equal protection of the laws, and unconstitutionally interfere with interstate commerce. The bills of the distributing companies also alleged that the Governor had directed the Attorney-General to bring suits to have them placed in the hands of receivers for the purpose of avoiding a judicial review of the orders of August 31, 1932.

An application was made for a temporary injunction. At the hearing thereon, the commission confessed that the second order made on August 31, 1932, was in conflict with section 66—118, R. S. Kan. 1923, which prescribes that an order cannot become effective until thirty days after it is entered, and consented that the enforcement of such second order might be permanently enjoined. We granted a temporary injunction against the enforcement of both orders.

The cases were consolidated for trial. Up-

on the trial the evidence introduced before the commission was received in evidence, supplemented by an agreed abstract of such evidence, and by stipulations and other evidence.

Counsel for the commission contend that the first order is not subject to any of the constitutional objections urged by the plaintiffs, namely, that it confiscates their property, interferes with their right to contract, and interferes with interstate commerce, because all that it does is to find that the contracts under inquiry are unreasonable, and the extent of such unreasonableness. They urge that the order does not take any property from the Cities Service Gas Company, that it still may continue to collect the 40-cent gate rate, that it does not take any property from the distributing companies, that they may still continue to charge their present rates until a valid order is made requiring them to make a decrease in their charges to their consumers, that it does not require the distributing companies to discontinue the contracts nor to discontinue any payments thereunder, and that such contracts remain in full force and effect.

There are two answers to this contention. The first order, entered August 31, 1932, expressly prohibits the distributing companies from giving consideration to the payments made to Henry L. Doherty & Company and to the Cities Service Gas Company for gas at the city gates in excess of 30 cents per thousand cubic feet "in fixing a rate for the domestic consumer" on and after September 1, 1932. These are two of the important items which enter into the cost upon which the distributing companies' rates are predicated, and the elimination thereof on September 1, 1932, from the rates charged the domestic consumers would have necessarily effected a substantial reduction in rates. Hence, the order is in substance and effect a rate-reducing order.

But, if it is only an order adjudging the contracts unreasonable and determining the proper amount which may be set up for expenditures thereunder as proper operating expense in determining rates for local consumers, and is only a preliminary step in a rate determination, the order is subject to review. Had the distributing companies failed to appeal from such order or seek a judicial review thereof within thirty days from August 1, 1932, it would have become final on September 1, 1932 (section 66—118, R. S. Kan. 1923), and the facts therein found would have become res adjudicata, and, in that event, at the hearing under the last paragraph of the second order, the companies could not have defended against an elimination of such items as a part of their operating cost in fixing their rates.

If the construction of counsel for the commission is correct, the order is plainly an attempt to avoid a judicial review in this court of the matters therein determined, and to deprive the distributing companies of their constitutional rights. This cannot be tolerated.

The power of a public service commission to inquire into contracts between the company furnishing the service or commodity, the rates for which are under inquiry, and its parent or holding company, has been the subject of judicial inquiry in recent cases. See Note 1.

NOTE 1. In Southwestern Bell Tele. Co. v. Public Service Commission, 262 U. S. 276, 43 S. Ct. 544, 547, 67 L. Ed. 981, 31 A. L. R. 807, the court said:

"The commission is not the financial manager of the corporation, and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses, unless there is an abuse of discretion in that regard by the corporate officers."

Again, in United Fuel Gas Co. v. Railroad Commission of Kentucky, 278 U. S. 300, 49 S. Ct. 150, 156, 73 L. Ed. 390, the court said:

"We recognize that a public service commission, under the guise of establishing a fair rate, may not usurp the functions of the company's directors and in every case substitute its judgment for theirs as to the propriety of contracts entered into by the utility; and common ownership is not of itself sufficient ground for disregarding such intercorporate agreements when it appears that, although an affiliated corporation may be receiving the larger share of the profits, the regulated company is still receiving substantial benefits from the contract and probably could not have secured better terms elsewhere."

But in Smith v. Illinois Bell Telephone Co., 282 U. S. 133, 51 S. Ct. 65, 70, 75 L. Ed. 255, the court said:

"The Western Electric Company not only manufactured apparatus for the licensees of the Bell system but engaged in other large operations and it cannot be merely assumed or conjectured that the net earnings on the entire business represent the net earnings from the sales to the Bell licensees generally or from those to the Illinois Company. Nor is the argument of the appellants answered by a mere comparison of the prices charged by the Western Electric Company to the Illinois Company with the higher prices charged by other manufacturers for comparable material, or by the Western Electric Company to independent telephone companies. The point of the appellants' contention is that the Western Electric Company, through the organization and control of the American Company, occupied a special position with particular advantages in relation to the manufacture and sale of equipment to the licensees of the Bell system, including the Illinois Company, that is, that it was virtually the manufacturing department for that system, and the question is as to the net earnings of the Western Electric Company realized in that department and the extent to which, if at all, such profit figures in the estimates upon which the charge of confiscation is predicated. We think that there should be findings upon this point."

Again, in the recent case of Western Distributing Company v. Public Service Commission of Kansas,

796

We think there can be no doubt, under the decision in Smith v. Illinois Bell Tel. Co., supra, and Western Distributing Co. v. Public Service Commission, supra, that the commission has power to inquire into the reasonableness of such contracts. The extent of such inquiry, however, has not been settled.

Counsel for plaintiffs contend that, while the commission may determine whether the contracts are fair and reasonable, and such as ordinarily prudent business men, dealing at arm's length, free from domination of a parent corporation, under the existing facts and circumstances would enter into, or whether they exact an unfair and unconscionable charge for a commodity or service, it may not determine and fix the interstate rate charged for such commodity or service.

It has been settled by repeated decisions of the Supreme Court that a state commission has no power to fix and regulate interstate gas rates. Hence, a state commission cannot fix the price to be charged for natural gas transported from one state to another and sold and delivered in bulk to an independent distributing company. Missouri ex rel. Barrett v. Kansas Natural Gas Co., 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027; People's Natural Gas Co. v. Public Service Comm., 270 U. S. 550, 46 S. Ct. 371, 70 L. Ed. 726; Public Utilities Comm. v. Attleboro S. & E. Co., 273 U. S. 83, 47 S. Ct. 294, 71 L. Ed. 549; Pennsylvania Gas Co. v. Public Service Comm., 252 U. S. 23, 40 S. Ct. 279, 64 L. Ed. 434; Public Utilities Co. v. Landon, 249 U. S. 236, 39 S. Ct. 268, 63 L. Ed. 577.

On the other hand, a state does have the power to regulate the price of gas brought into a state and sold directly to the consumer, because "the business of supplying, on demand, local consumers is a local business, even though the gas be brought from another state and drawn for distribution directly from interstate mains; and this is so whether the local distribution be made by the transporting company or by independent distributing companies." Missouri ex rel. Barrett v. Kansas Natural Gas Co., 265 U. S. 298, 309, 44 S. Ct. 544, 546, 68 L. Ed. 1027; Penna. Gas Co. v. Public Service Com., 252 U. S. 23, 40 S. Ct. 279, 64 L. Ed. 434; East Ohio Gas Co. v. Tax Commission, 283 U. S. 465, 51 S. Ct. 499, 75 L. Ed. 1171.

We are of the opinion that the facts here justify the conclusion that the Cities Service Company, together with the Gas Service Company, the distributing companies, the Empire Gas & Fuel Company, and the Cities Service Gas Company are engaged in a common enterprise, namely, the transporting and furnishing of gas to local consumers; that the Cities Service Company exercises such complete dominion and control over the Cities Service Gas Company and the distributing companies that, under the general rules of agency, the Cities Service Gas Company and the distributing companies are mere agencies or instrumentalities of the Cities Service Company; and that, in substance and effect, the Cities Service Company is, through such agencies, supplying gas to local consumers on demand and is engaged in a local business. If this be true, the commission had the power to determine the reasonableness of the charge set up as operating expense for gas at the city gates in fixing the local rate. That could only be done by determining a reasonable return to the Cities Service Gas Company for producing, transporting and delivering such gas at the city gates.

However, if we grant that the commission can only scrutinize and inquire into the reasonableness of such contracts, we are of the opinion that the same result necessarily follows. Since the Cities Service Company enjoys a monopoly and affords the only reliable source for supplying gas to the distributing companies, the only method of de-

---

285 U. S. 119, 52 S. Ct. 283, 285, 76 L. Ed. 655, the court said:

"The appellant adverts to the fact that in its bill of complaint are included a number of averments not denied by the appellees. In brief, these are that the company does not own or produce any natural gas; that the only source of supply for the city of Eldorado is the main of the Cities Service Gas Company; that no supply at a lower price can be obtained from any other source; that the same rate is being charged to other distributing companies along the lines of the Cities Service Gas Company, and was being charged by another independent pipe line to another city; that an ineffectual effort had been made to find local gas available to Eldorado; and that appellant had attempted to get a lower rate from Cities Service Gas Company but could not do so. It is urged that, as these averments were uncontradicted, they constitute, when taken with the facts previously stated, a prima facie case for the reasonableness of the rate charged. This might well be true were it not for the fact of unity of ownership and control of the pipe line and the distribution system. An averment of negotiation and effort to procure a reduction in the wholesale rate means little in the light of the fact that the negotiators are both acting in the same interest—that of the holding company which controls both. All of these facts so averred in the pleadings would be far more persuasive with respect to the propriety of the rate if the parties were independent of each other and dealing at arm's length. Where, however, they constitute but a single interest, and involve the embarkation of the total capital in what is in effect one enterprise, the elements of double profit and of the reasonableness of inter-company charges must necessarily be the subject of inquiry and scrutiny before the question as to the lawfulness of the retail rate based thereon can be satisfactorily answered."

termining the fairness and reasonableness of the charge at the city gates is to determine the reasonableness of the return to the Cities Service Gas Company on their property used and useful in the business. Any charge in excess of that for gas at the city gates, under the contract between two subsidiary corporations who have the same parent or holding corporation, would be unfair and unreasonable.

It follows that we must determine the value of the property of the Cities Service Gas Company used and useful in the business of producing, transporting, and delivering gas, the amount of its earnings, and a fair return on such property. The case has been tried so that the facts necessary to make these determinations are before us.

We have made and filed findings of fact, and in foot-notes thereto expressed our reasons therefor, and in this opinion will only state the ultimate facts so found.

██ In determining these facts, we have kept in mind that the findings of the commission are presumed to be correct [Banton v. Belt Line Ry. Corp., 268 U. S. 413, 422, 45 S. Ct. 534, 69 L. Ed. 1020; Cotting v. Kansas City Stock Yards Co., 183 U. S. 79, 22 S. Ct. 30, 46 L. Ed. 92; Denver Union Stock Yard Co. v. United States (D. C. Colo.) 57 F. (2d) 735, 739], but that, on the question of confiscation, the plaintiffs are entitled to the independent judgment of a judicial tribunal as to the law and facts. United Railways & E. Co. v. West, 280 U. S. 234, 251, 50 S. Ct. 123, 74 L. Ed. 390; Bluefield W. W. & Imp. Co. v. Public Service Commission, 262 U. S. 679, 689, 43 S. Ct. 675, 67 L. Ed. 1176; Ohio Valley W. Co. v. Ben Avon Borough, 253 U. S. 287, 40 S. Ct. 527, 64 L. Ed. 908; Lincoln Gas & Elec. Light Co. v. Lincoln, 223 U. S. 349, 32 S. Ct. 271, 56 L. Ed. 466; Crowell v. Benson, 285 U. S. 22, 60, 52 S. Ct. 285, 296, 76 L. Ed. 598.

In the case last cited, the court said:

"In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function. The case of confiscation is illustrative, the ultimate conclusion almost invariably depending upon the decisions of questions of fact. This court has held the owner to be entitled to 'a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both the law and facts.'"

██ The value of the property of the Cities Service Gas Company, used and useful in its business of producing, transporting, and supplying gas to the distributing companies at the city gates, was found by the commission to be $73,170,510. We find such value to be at least $82,380,582. The net available annual return from such property was found by the commission to be $7,161,793. We find such return to be $5,860,327, or a return of 7.11 per cent. on the present value of the property.

If the charge made by the Cities Service Gas Company for gas at the city gates was reduced to 30 cents per thousand cubic feet, it would result in a reduction of $1,926,145.07 in its net income. This would reduce its return to 4.8 per cent. on the present value of its property used and useful in the business.

We are of the opinion that a return of approximately 8 per cent. upon present values is necessary under present conditions to assure confidence in the financial soundness of the Cities Service Gas Company, to maintain its credit, and to enable it to raise money necessary for the discharge of its public duties, and that any return substantially lower than 8 per cent. would be confiscatory. United Railways & E. Co. v. West, 280 U. S. 234, 253, 50 S. Ct. 123, 74 L. Ed. 390; Smith v. Ill. Bell Telephone Co., 282 U. S. 133, 161, 51 S. Ct. 65, 75 L. Ed. 255.

The undisputed evidence shows that if the distributing companies are compelled to pay 40 cents per thousand cubic feet for gas at the city gates and to base their rates to consumers on the price fixed as reasonable by the commission in its order of August 31, 1932, they will have no earnings in excess of operating expenses to cover depreciation and afford any return on the value of their property used and useful in the business. Upon the trial, it was stipulated that the Cities Service Gas Company could not continue its business without the patronage of the distributing companies.

We conclude, therefore, that 40 cents per thousand cubic feet for gas at the city gates is a reasonable charge; that to compel the Cities Service Gas Company to furnish such gas at 30 cents per thousand cubic feet will result in confiscation of its property, and that to compel the distributing companies to pay 40 cents per thousand cubic feet for gas at the city gates and permit them to set up only 30 cents thereof in their operating expense, in fixing their rates to local consumers, will result in confiscation of the properties of the distributing companies.

■■ We have found that the distributing companies in their proof before the commission failed to establish that the payments of 1¾ per cent. under the Henry L. Doherty & Company contracts were fair and reasonable, and therefore proper items of expense to be considered in determining local rates for gas.

We set out the applicable provisions of the Kansas statute in Note 2.

Henry L. Doherty, doing business under the name of Henry L. Doherty & Company, has built up and maintains a complete organization for the designing, construction, operation, development, and management of public utilities, oil and natural gas properties. This organization consists of 1,687 employees, among whom are included experienced executives, financial advisers, construction, valuation, electrical and oil and gas engineers, geologists, technicians, rate experts, accountants and operators. Henry L. Doherty & Company also maintains a department for the purchase, sale, promotion, and transfer of stocks of the various subsidiary corporations of the Cities Service Company, a foreign oil department, a steamship and tank-car department, an oil producing and refining department, and a real estate division chiefly concerned with New York real estate.

As stated in our findings, the activities of Henry L. Doherty & Company embrace many matters not covered by such contracts, the expense of which cannot properly be charged to the distributing companies.

The evidence before the commission consisted of proof that Henry L. Doherty & Company is not operated for profit, of the services rendered to the distributing companies by it, and of the cost and expense of maintaining the Henry L. Doherty & Company organization. There was no separate proof of the expense which might properly be allocated to the services rendered under such contracts. Therefore, we have concluded that the distributing companies failed to meet the requirements of the Kansas statute by showing in detail the items of service rendered under such contracts and the cost thereof. Furthermore, it was impossible to determine from the evidence before the commission whether the charge for the services rendered by the distributing companies was fair and reasonable, because the proof was of the total cost and expense of maintaining Henry L. Doherty & Company, which included many activities unrelated to and of no benefit to the distributing companies; and there was no proper allocation of the cost and expense of such unrelated activities.

We are of the opinion that the burden of proof, both under the Kansas statute and under general principles, was upon the distributing companies. Smith v. Illinois Bell Tel. Co., supra; Michigan Law Review, Nov. 1932, pp. 16–24.

Counsel for the commission contend that the services rendered by Henry L. Doherty & Company are a duplication of the services rendered by the Gas Service Company, and are therefore not necessary or useful to the distributing companies. With this we cannot agree. The Gas Service Company is equipped to render such services only in minor and relatively unimportant matters.

The expense of each distributing company maintaining a separate organization like that of Henry L. Doherty & Company would be prohibitive. For that reason it is in keeping with sound business principles for it to contract with Henry L. Doherty & Company, or some similar organization, for such services. We therefore conclude that, while the services contracted for are necessary and useful to the distributing companies and that the contracts in that respect are proper, the proof adduced was insufficient to meet the requirements of the Kansas statute or to enable the commission to determine whether the charges for such services were fair and reasonable.

Certain incidental matters require a limited discussion.

■ The commission held that certain gas leases claimed to be held by the Cities Service Gas Company for gas reserves were in excess of the required reserves, and that they were in fact being held for speculative purposes. The evidence established, and we have found, that the officers and directors of the Cities Service Gas Company, who are men of broad experience in the natural gas business, in the exercise of an honest and, we think, sound business judgment, determined that such leases were necessary to afford it an adequate gas

NOTE 2, Section 74—602c, 1931 Supp. R. S. Kan. 1923, is as follows:

"Showing required for fixing or charging rates. In ascertaining the reasonableness of a rate or charge to be made by a public utility, no charge for services rendered by a holding or affiliated company, or charge for material or commodity furnished or purchased from a holding or affiliated company, shall be given consideration in determining a reasonable rate or charge unless there be a showing made by the utility affected by the rate or charge as to the actual cost to the holding or affiliated company furnishing such service and material or commodity. Such showing shall consist of an itemized statement furnished by the utility setting out in detail the various items, cost for services rendered and material or commodity furnished by the holding or affiliated company."

reserve, and that such leases were acquired and are held by it as bona fide reserves, and not for speculation.

The commission was not empowered to substitute its judgment for that of the officers and directors of the Cities Service Gas Company as to the amount of leases necessary to afford an adequate gas reserve, in the absence of a showing of abuse of discretion by such officers in that regard. Southwestern Bell Tel. Co. v. Public Service Com., 262 U. S. 276, 289, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; State Public Utilities Com. v. Springfield Gas & Elec. Co., 291 Ill. 209, 234, 125 N. E. 891; People v. Stevens, 203 N. Y. 7, 96 N. E. 114, 117; Idaho Power Co. v. Thompson (D. C. Idaho) 19 F.(2d) 547, 580; Kansas City, K. V. & W. Ry. Co. v. Bristow, 101 Kan. 557, 167 P. 1138, 1140, L. R. A. 1918E, 342; Denver Union Stock Yard Co. v. United States (D. C. Colo.) 57 F.(2d) 735, 748.

 Counsel for plaintiffs contend that there should be included in the valuation of the Cities Service Gas Company $3,422,512 to cover initial cost of financing. This item was wholly disallowed by the commission. We are of the opinion that the commission's decision was right under the authority of Galveston Elec. Co. v. Galveston, 258 U. S. 388, 397, 42 S. Ct. 351, 66 L. Ed. 678, and Denver Union Stock Yard Co. v. United States, supra, page 742 of 57 F.(2d).

We conclude that that portion of the first order of the commission, made August 31, 1932, that the distributing companies should give no consideration to the payments for gas at the city gates in excess of 30 cents per thousand cubic feet in fixing the rate for the domestic consumer, and the whole of the second order, made August 31, 1932, should be permanently enjoined; and that the temporary injunction against the Attorney-General, being no longer necessary, should be dissolved.

Let decrees in accordance with the foregoing be prepared and submitted.

HOPKINS, District Judge, dissenting.

### Supplemental Memorandum.

PHILLIPS and McDERMOTT, Circuit Judges.

We are advised that a misunderstanding exists among counsel as to the scope of the opinion and findings as to a reasonable return, a misunderstanding doubtless contributed to in part because the court acceded to the suggestion of counsel that findings be made

as to all controverted issues, and in part by differing conceptions as to the elasticity of the words "substantially" and "approximately." While supplemental memoranda often confuse instead of clarify, an interpretative résumé may not be amiss.

 A "reasonable rate" is not a particular decimal. A "reasonable rate" is one that falls within the zone of reason; it is a field, and not a mathematical point. The lower limit of the zone of reason is confiscation, that is, a denial of a net return sufficient to preserve the property and to attract capital necessary to enable the utility to discharge its public duties. A finding that a particular rate is reasonable is not, therefore, a finding that every other rate is either unreasonable or confiscatory.

With the determination of the proper rate within that zone of reason, the courts are not concerned, for that is a legislative matter. As jurisdiction is invoked here, and generally in such cases, the courts decide but one question: Does the prescribed rate fall below the lower limit of the zone? The rate order in this case allowed a return of 4.8 per cent. on the fair value of the property. The issue tendered is the validity of that order. We have held, and hold, that such order is confiscatory. Except in rough approximation, and by way of recital of evidence in the record, we have not undertaken to fix with precision the lower limit of this zone of reason.

### Findings of Fact.

#### I.

The citizenship and official position of the parties are as stated in the bills of complaint. There is diversity of citizenship in 1646-N, 1644-N and 1645-N, in which cases the Cities Service Gas Company, the Union Public Service Company and the Western Distributing Company are respectively plaintiffs. All of the cases involve a substantial federal question and in each of the cases there is more than $3,000 in controversy.

#### II.

On July 2, 1931, an order was entered by the Public Service Commission of Kansas, on its own initiative, directed to the plaintiffs herein except the Cities Service Gas Company, finding that the reasonableness of all contracts with, and charges made to, the respondents, by corporations owning the stock of the respondents, and of the contracts between Henry L. Doherty & Company and respondents, should be inquired into; the respondent distributing companies were or-

dered to show cause why payments made under such contracts, if found to be unreasonable, should not be disallowed as operating expenses. A copy of said order is Exhibit "A" to the bills of complaint of the distributing companies.

## III.

Pursuant to such order, extensive hearings were held. The properties of the Cities Service Gas Company, situated in five states, were appraised by engineers for both sides, and valued by the commission. The testimony and exhibits comprise many volumes; the expense of the trial, including the appraisement of the engineers, exceeded $300,000. On July 20, 1932, the Commission found that the payment of 1¾ per cent. of gross revenues made by the distributing companies to Henry L. Doherty & Company were unreasonable; that any rate paid by the distributing companies to the pipe line company (the Cities Service Gas Company) in excess of 29.5c per thousand cubic feet for natural gas delivered to the mains of the distributing companies was unreasonable. (Note 1.) The distributing companies were ordered (1) to cease setting up on their books the payments of 1¾ per cent. to Henry L. Doherty & Company, and any payment for gas in excess of 29.5c per thousand cubic feet, and (2) to give no consideration to any such payments in fixing 'their rates to the domestic consumers, and (3) to reduce their rates to the consumers proportionately, pending a final determination of their rates; notice was given to show cause why such reductions should not be made permanent. A copy of such findings and order with an elaborate supporting opinion are attached to the bills by reference.

## IV.

A petition for rehearing on 51 grounds was filed, and allowed as to one. Upon rehearing, a slight addition was made to the value of the properties of the pipe line company, and the city gate rate was increased from 29.5c to 30c per thousand cubic feet. The order entered in July was again entered, this time as two orders; part (3) of the July 20th order, requiring a reduction in rates pending further hearing, was incorporated in a separate order. Upon the hearing of the application for a temporary injunction,

NOTE 1. The city-gate rate is referred to throughout the record, and in these findings, as the "40c rate." That is the usual charge per thousand cubic feet for gas delivered to the mains of the distributing companies; local conditions lowered that rate to certain cities supplied by the pipe line company, bringing the average down to the 39.5 cents referred to in the opinion and order of the commission.

counsel for the commission confessed. that part of the order to be invalid.

## V.

Except for qualifying shares, the common stock of the distributing companies is owned by the Gas Service Company, the stock of which in turn is owned by the Cities Service Company. The common stock of the Cities Service Gas Company is owned by the Empire Gas & Fuel Company, the voting stock of which in turn is owned by the Cities Service Company. The Empire Gas & Fuel Company has a preferred stock issue outstanding in the hands of the public. Henry L. Doherty & Company is Henry L. Doherty, who owns 35 per cent. of the voting stock of the Cities Service Company. The Cities Service Company, by stock ownership, legally controls the policies of the distributing companies and the pipe line company; and Henry L. Doherty in fact controls the policies of the Cities Service Company. The distributing companies do not deal at arm's length with either the Cities Service Gas Company or Henry L. Doherty & Company.

## VI.

The distributing companies, plaintiffs, are engaged in the distribution and sale of natural gas to domestic and industrial consumers. They operate in 128 cities and towns in Kansas. Their only dependable source of supply is the other plaintiff, the Cities Service Gas Company. Except for a few local gas fields of uncertain life, the distance of the gas fields from the localities served, and the cost of pipe line construction, are such that the Cities Service Gas Company has a practical monopoly on the sale of gas to the distributing companies. There is no agreement between the Cities Service Gas Company and the distributing companies as to the amount of gas that will be purchased; the oral arrangement is simply that the pipe line company will supply the present needs of the distributing companies at 40c per thousand cubic feet delivered to their mains.

## VII.

Prior to 1910 and during the years since then Henry L. Doherty, doing business under the name of Henry L. Doherty & Company, has built up and now maintains a complete organization for the design, construction, operation and development of public utilities, oil and natural gas properties. This organization is composed of experienced executives, financial advisers, construction, valuation, electrical, oil and gas engineers, geologists, chemists, technicians, experts, accountants

and operators. There are approximately 1,687 employees.

The same organization maintains departments for the purchase, sale, promotion and transfer of stocks of the various companies allied with the Cities Service Company; a foreign oil department; steamship and tank-car department; an oil production and refining department; a real estate division chiefly concerned with New York real estate.

Each of the plaintiffs has entered into a contract with Henry L. Doherty & Company, by which the latter agrees to furnish the following services, subject to the control of the Board of Directors of the plaintiffs:

"I. Personnel. In so far as your corporation may desire, it is proposed to supply you with experienced executives and operators necessary for your business.

"II. Executive Service. Our staff of executives, financial advisers, engineers and accountants will advise and assist in franchises, rates, matters of public relations, and all matters of insurance, supervise expansion of territory and business, acquisition of additional properties, etc.

"III. General Accounting Services. Our Accounting Department will periodically audit the books of your corporation and generally advise in accounting problems and in the developments in accounting practices and procedure, and furnish the services of certified public accountants where special audits are required.

"IV. Statistical Services. Our Statistical Department will supply comparative statements of operating results of the various companies under our supervision and will also supervise or furnish statistical reports to financial institutions, government bureaus, and similar organizations.

"V. Purchasing Services. We will give you the benefit of the services of our Purchasing Department with regard to the purchase of equipment, supplies, generally advise as to the desirable equipment, etc.

"VI. Designing and Construction Engineering. Our engineering staff will be available at all times to carry out all preliminary investigations requisite to determining the advisability of any proposed construction, will check the details of engineering design, perform engineering work where requested, and generally check the efficiency of your plant.

"VII. Financial Services. The Financial Department will provide plans for financing and for funds for capital requirements, including construction and additions to prop-

erties and acquisition of new properties; for the refunding of maturing obligations; will act as paying agent for coupons and dividends, and assist in the arranging of bank loans. Also the Financial Department will furnish your corporation with a budget system for the advanced determination of financial requirements and operating results.

"VIII. Securities Department. The Securities Department will provide plans for the sale and distribution of various securities, and will formulate and carry out campaigns for sales under customer ownership plans, etc.

"IX. Valuation. The Valuation Department will, when required, prepare inventories and appraisals of property, and will advise as to experts who may be required to testify in valuation cases, and will generally assist in the preparation of the same.

"X. Tax Department. The Tax Department will prepare or supervise the preparation of federal and other tax returns and generally keep in touch with taxation problems.

"XI. New Business Department. The New Business Department will serve in the purchase and sale of appliances and equipment for resale, the determination of sales policies, promotion programs and sales personnel, in research and laboratory tests on domestic appliances, etc.

"XII. Technical and Research Department. The Technical and Research Department will furnish a consulting service on all technical problems encountered by your corporation.

"Compensation. For the above services your corporation will pay as follows:

"1. A management fee equal to one and three-fourths per cent. (1¾%) of its gross revenues, after deducting intercompany sales for resale.

"2. An engineering fee equal to five per cent. (5%) of the cost of construction.

"3. For the services of our Securities Department to purchase outright blocks of securities issued by your corporation or to distribute such securities to investors, we will charge a fee to be mutually agreed upon, depending on the character of security offered and general market conditions when the offer is made.

"In addition, your corporation will pay the expenses, disbursements and reasonable per diem charge for our representatives while at the properties of your corporation or traveling for it on special matters."

Payments received under these contracts are paid over to Cities Service Company,

which in turn pays all the expenses of Henry L. Doherty & Company, without profit to Henry L. Doherty. The 1¾ per cent. payment is not made on intercompany sales; that is, the Kansas consumer pays the 1¾ per cent. but once.

## VIII.

The Gas Service Company, with offices at Kansas City, Missouri, renders certain services to the distributing companies, for which a payment is made that is not here under review. While the same type of service is rendered under each of such contracts, there is no unreasonable duplication of service. Henry L. Doherty & Company furnish services which the Gas Service Company is not equipped to furnish. For example, the counsel and engineer employed by Gas Service Company can and do adequately handle the routine matters involving rates and service that arise in ordinary operations; they are not equipped to handle matters of the magnitude of this litigation; in such cases, the engineering and legal staffs of Henry L. Doherty & Company are employed. We find that this contract places at the disposal of the distributing companies engineering, legal, accounting, geological, and business services of value, and of a character and extent which could not as economically be availed of by separate distributing companies or by any small group of them; that similar contracts are made by other public utilities with similar organizations, such as Ford, Bacon & Davis, and Stone & Webster; that the propriety of such contracts is for the owners of the companies to determine.

## IX.

The activities of Henry L. Doherty & Company embrace many matters not covered by the 1¾ per cent. contract, the expense of which is not a proper operating charge of the distributing companies. These activities are: The promotion, sale, and transfer of securities of the Cities Service Company and its affiliates. No securities of the distributing companies have been marketed by Henry L. Doherty & Company, and if they are, the contract provides for a separate fee for such services. The production, sale and transportation of oil, and the handling of New York real estate, are unrelated activities. The record discloses no reason for these distributing companies maintaining a London office.

The following activities of Henry L. Doherty & Company are or may be of direct benefit to the distributing companies:

Activities tending to increase the consumption of natural gas, by advertising and by development and marketing of gas-burning appliances; the geological department; the technical and research division; the tax, valuation and rate divisions; the purchasing department; the public utilities operating department; the department dealing with the training of personnel; the natural gas department; the corporate records department; the legal, engineering, accounting, auditing, finance and construction divisions.

## X.

The record discloses that the expenses of Henry L. Doherty & Company exceeded its receipts, over a ten-year period, in the amount of $1,768,440.26, the deficit being made up by the Cities Service Company. The expenses for one year are classified, and from that classification a rough approximation of the expenses properly chargeable to the natural gas business is possible; something less than one-half of the 1931 expenses appears to have been incurred in activities not contemplated by the contract and not properly chargeable to operating expenses; certain large items, such as executive and office service, include the expense of both related and unrelated services. But the receipts are not classified. The utility business pays 1¾ per cent.; the oil business 1 per cent.; the securities business apparently pays nothing directly, except that Cities Service Company makes up the deficit. But whether this is a fair division, the record does not disclose, except that the deficit, over a ten-year period ending in 1930, has been about 7 per cent., while the expenses of the securities business for 1931 were close to 35 per cent. It is therefore impossible to tell, from this record, anything about the pivotal question of whether the payments made by the distributing companies bear any fair relation to the expenditures properly made on their behalf. We cannot therefore find whether 1¾ per cent. is too much or too little; it is probable that, until some segregation is made of departments, and perhaps a segregation of expenses within some of the departments, no accurate finding on this point can be made. If the entire 1¾ per cent. is eliminated, the reduction of the average gas bill would be about ten cents a month. The record discloses that a part, at least, of such payment is proper. A finding of the amount thereof should be made, in the first instance, by the commission.

## XI.

We find that it is of value to the distributing companies to have available a central organization equipped to render services of the

character described by the contract, on demand; that the payment of the per diem charge, the percentage on construction contracts, and the fee for the sale of securities, does not meet the expenses of such service, since much of the service is rendered without such specific charges. That whether such contract is advisable is for the officers of the distributing companies to determine. That the actual expenses of such services, if fairly allocated, is a proper operating charge.

We find it is not practicable to allocate with precision the cost of such general services to each distributing company, except so far as it is now allocated by the per diem and per cent. charge in the contract. We find it practicable to segregate the cost of the services rendered to the public service companies, engaged in selling gas, and perhaps electricity, to the public, from the cost of services rendered to companies engaged in the oil business, and from the expenses incurred in the promotion and sale of securities. The consumers of natural gas and electricity have no interest in the oil or stock business, and such private businesses ought not to be thrown into a common pot with the business of serving the public, the expenses of all hopelessly intermingled, and then proportioned back to the public by those interested in the private business.

## XII.

The Cities Service Gas Company was organized in 1926. It took over the physical properties of five pipe line companies, having a plant investment account, at that time, of $52,182,525.98. These pipe line companies served many communities in Oklahoma, Kansas and Missouri. The companies taken over were integrated, so that gas could be run from the mains of one system into that of another, and the supply thereby made more dependable and economical. Natural gas had long been used for lighting and cooking in most of these cities and towns. Years ago, gas had been freely used for heating, but the uncertainty of the supply, caused in part by lack of capacity of the wells to meet the peak demands and in part by the frailties of the pipe line system, had driven the ordinary householder back to coal. The discovery of the extensive and prolific gas field at Amarillo, and later at Hugoton, Kansas, removed the first obstacle; large sums expended in new mains, and in repair of old ones, largely removed the second. The supply becoming again dependable, a vigorous campaign was waged for household heating, and for industrial uses to absorb the excess in off-peak seasons. The Cities Service Gas Company now has an adequate and dependable supply of gas, available at all times at the city gates. The Cities Service Company acquired the distributing companies in order to insure adequate service to the ultimate consumer, on the theory, doubtless, that a chain is no stronger than its weakest link. The service to the public is now sufficient and efficient. While these improvements in service were being made, electricity supplanted gas for lighting, and is making serious inroads on the cooking, while fuel oil is proving a formidable competitor for heating. The original cost, or prudent investment, in the pipe line company's properties is somewhat obscure; the properties were acquired by a merger of other companies, whose original investment accounts cannot now be thoroughly checked. The probabilities are that the book cost of the properties is around $90,000,000. The system consists of 4,400 miles of pipe lines, 11 compressor stations, and 1,225,000 acres of gas leases, and gas wells on a part thereof.

## XIII.

There is no substantial dispute as to the inventory; the disagreement is over the present values of the properties. The valuations made by engineers for both sides, and by the commission, is on the basis of cost of reproduction new, less accrued depreciation. The present values are, on the extensive constructions of the last few years, less than the prudent investment therein. Both engineers arrived at the present per cent. condition by inspection, although the amount of properties inspected differed somewhat. The engineers for the plaintiffs value the properties at $105,000,000; the engineers for the commission, and the commission, at $73,000,000. Approximately $22,000,000 of this difference is in four items, gas leases, going concern value, cost of financing, and interest during construction. The remaining difference grows out of differences in valuations of the numerous items in the inventory. While this court has made an independent investigation of the facts, it has done so with the knowledge that the commission had the benefit of hearing the witnesses, and that there is a presumption that its findings are correct. Unless, therefore, the record discloses some substantial reason to the contrary, the findings of the commission have not been disturbed. The commission apparently gave little or no weight to the factor of original cost, although when present values were higher than cost, great weight was accorded that factor by commissions generally. We have found it unnec-

essary to explore the question of what weight should be given to that factor.

In the following findings of value, the commission's finding is adopted, because presumptively correct, except where there is an explanatory note.

## XIV.

The properties of the Cities Service Gas Company, used and useful in the public service as of September 1, 1931, are as follows:

| Number and Title of Account | Depreciated Value |
|---|---|
| 1307 Production—Right-of-way ⎱ *....... $ | 64,778 |
| 1327 Transmission—Right-of-way ⎰ ........ | 1,915,427 |
| 1310 Production—Field measuring station structures ........................... | 35,909 |
| 1311 Production—Other Structures ........ | 47,876 |
| 1312 Production—Gas Well Construction ⎱ * | 1,294,710 |
| 1313 Production—Gas Well Equipment ⎰ . | 658,439 |
| 1314 Production—Field Line Equipment*.. | 3,523,176 |
| 1315 Production—Field measuring station �️ * equipment .......................... ⎬ | 265,746 |
| 1332 Transmission—Measuring station equipment .......................... ⎰ | 759,625 |
| 1316 Production—Drilling and cleaning equipment ........................... | 27,908 |
| 1317 Production—Other Equipment ........ | 1,333 |
| 1325 Transmission—Land* ................. | 147,202 |
| 1328 Transmission—Compressing Station Structures⁺ ......................... | 1,515,662 |
| 1329 Transmission—Measuring Station Structures ......................... | 133,310 |
| 1330 Transmission—Other Structures....... | 113,341 |
| 1331 Transmission—Compressing Station Equipment* .......................... | 8,463,835 |
| 1333 Transmission—Line Equipment*....... | 40,232,331 |
| 1334 Transmission—Other Equipment...... | 5,633 |
| 1376 General—Other Land ................. | 3,655 |
| 1379 General—Other Structures ........... | 94,687 |
| 1380 General—Office Equipment ........... | 106,035 |
| 1381 General—Store Equipment ........... | 1,805 |
| 1382 General—Shop Equipment ............ | 23,084 |
| 1383 General—Stable Equipment .......... | 568 |
| 1384 General—Garage Equipment ......... | 81,448 |
| 1385 General—Laboratory Equipment ..... | 8,202 |
| 1386 General—Telephone and Telegraph System ............................ | 415,070 |
| 1387 General—Tools and Implements....... | 44,979 |
| 1388 General—Other Equipment ........... | 21,832 |
| Total ................................. | $60,007,606 |
| Forward—Physical Properties ............. | $60,007,606 |
| Engineering and Superintendence during Construction* ......................... | 3,321,250 |
| Preliminary and Organization Expense*... | 500,625 |
| Administration and Legal Expense during Construction ......................... | 350,350 |
| Miscellaneous Construction Expenditures.. | 700,700 |
| Taxes during construction ................. | 875,171 |
| Interest during construction*.............. | 4,471,934 |
| Working Capital ....................... | 775,000 |
| Materials and Supplies*.................... | 623,675 |
| Gas in Line............................ | 22,000 |
| Going Concern Value*.................... | 5,000,000 |
| Gas Leases*............................ | 5,727,272 |
| Rate Base ............................. | $82,380,583 |

**1307–1327.** (Mr. Black was the engineer for the commission; Mr. Hamilton for the plaintiffs. Both are engineers of standing.) The commission allowed $1.40 a rod for right of way. It used $1.08 as a basis, that figure being the average cost, as shown by the books of the company, of 31 per cent. of its rights of way. To this the commission added 22c per rod for expense of acquisition, and 10c a rod for abstracts and recording fees. The evidence clearly developed that the figure of $1.08 did not purport to represent all of the costs, and is not a dependable figure. The most dependable evidence is that of the man who negotiated for these rights of way during the past four years. His offering price, to all landowners, was 50c per rod for the land and 50c per rod for damages; sometimes he paid as much as $2.00 per rod for the land alone; the average damage paid was 65c. He did not state the average cost for the land, but it cannot be assumed that he acquired all of it at his offering price. It should not be figured lower than 65c, the average he paid for damages for which his offer was likewise 50c. These items make $1.30 per rod paid the landowner; adding to that the 32c allowed by the commission for overhead, gives the figure of $1.62 which we have used. The company's figure of around $3.00 includes aerial surveys which were not used, and if used, probably would have been worth their cost in a saving not reflected in its present valuation. Apparently, the company also included certain construction costs elsewhere accounted for.

**1312–1313.** We have added two items to this joint account. The commission deducted $57,235 from its engineer's valuation on a purely legal ground. It appears that in the Craig and Augusta fields, the company uses dry holes, or played out wells, for storage; that is, excess gas from producing wells is turned into the dry holes, and the gas thereby stored for future use. It is not denied that the wells are properly used for storage, and for a public purpose; the claim is that the landowner has the property interest in the hole in the ground. Upon the trial before this court, it was conclusively proven that the company has entered into gas leases, with royalties paid in advance, for the use of these wells. Its rights thereto are the same as in producing leases. The assumption of fact made by the commission is erroneous; the legal conclusion need not be examined.

The other item is $84,318 growing out of the cost of gas well construction. The company's figures were considerably below actual cost, and below the cost of adjacent wells drilled by other companies to the same depth. The engineer for the commission omitted certain items in his calculations, which may account for his figures being so much below the actual cost of such construction. The commission's figures are so far below the cost of these wells, or any other well

in the vicinity, that they approach the arbitrary.

Counsel for the commission suggests that the commission's valuation is too high, because the per cent. condition was computed on a straight line basis, whereas in fact, as he says, the gas wells depreciate more rapidly during their early years. None of the witnesses support this theory; it introduces a highly speculative element into an already troublesome problem; it is of no practical significance in this case, because the number of wells is large and of varying ages, and any theoretical error as to a single well is leveled out by the law of average.

1314. We have added $397,017 to this account. The commission adopted Mr. Black's estimate, which was based on assumption that field lines were buried, on the average, to one-half the depth of main lines. The company's valuation was based upon the facts. Black testified his figures would have been more accurate if he had had time to gather the facts. It clearly appears, also, that field lines are more expensive to construct than main lines; they are in smaller units; more hand-labor is involved, and more connections are necessary; also the cost of field lines cannot be decreased by taking advantage of topography, as may generally be done with main lines. The company's figures are strongly buttressed by an analysis of actual cost of field lines utilizing 20,600 tons of pipe. The assumptions of the commission and its engineers cannot stand against the facts.

1315–1332. These accounts are treated together, and we find nothing from which to resolve the conflict between the engineers. The commission rejected Hamilton's value because without supporting data; on rehearing the data was furnished, several volumes of it. It still leaves the conflict. We therefore use the commission's valuation.

1325. We have added $2,000, the value of the land at the Hogshooter compresser station. The commission eliminated this land, and the structure and equipment, on the ground that it was an abandoned station. The station is an old one, and has not been in use since 1925, because the gas fields supplying it were exhausted, and it was not so located as to serve other fields. In February, 1931, it was returned for taxes as an abandoned structure, at junk value. Since that date, new gas fields have been discovered, and it is undisputed that the station is now strategically located, and plans and requisitions have been prepared to make the necessary alterations to put it back into immediate service. This undisputed evidence, corroborated by the physical facts, cannot be ignored because a tax return was made that at an earlier date it was abandoned. It is not now in service, except as an emergency station, but it is a component part of the system as it now exists. If eliminated now, a readjustment of the rate base would be necessary as soon as the work now requisitioned for is completed. We have restored this station to the rate base, using the valuation of the commission's engineer.

1328. We have added the Hogshooter structure at Black's value of $49,560. We have not added the compressor stations at Owasso or Hominy. There is a difference of about $700,000 in the value of the structures at other compressor stations. Each engineer is corroborated by contractors who estimated the cost of reproduction. The engineers and contractors testifying are all reputable and capable men. We therefore hold that the presumption of correctness attaching to the finding of the commission has not been overcome.

1331. We have added the Hogshooter equipment at Black's valuation.

1333. The difference between the engineers' valuations of this item is about $4,000,000. The dispute narrows down to three items: (1) The commission found the property to be in 90.1 per cent. condition. The company asserts it to be in 92.93 per cent. condition. The commission's finding is supported by the testimony of its engineer, and a consulting engineer called by the company. We approve the commission's finding as to per cent. condition. (2) The cost of rock-excavation. There was a dispute among the experts, but the commission's finding is supported by the testimony of its engineer and a contractor who had done much of this work. Elaborate comparisons of costs of selected lines are introduced to show the error in the commission's cost figure. But the results depend largely on the lines selected. While not entirely satisfied with the figure used, we are not disposed to disapprove the finding as to the cubic yard cost. (3) There is a difference between the engineers as to the amount of rock excavation in the lines. After the hearings before the commission, engineers for both sides drilled a hole every quarter of a mile along a main 125 miles long. That extensive investigation developed that the percentage of rock excavation was 20.94 per cent. instead of 10.46 per cent. used by Black. If overcuts are included, the percentage is 28. We are inclined to believe that overcuts should be excluded; it is probable

that contracts for trenches would be predicated on the trench depth, and would not call for overcuts caused by the inability to blast to a neat line. This additional evidence convinces us that Black's estimate of the amount of rock excavation is too low. His estimate on the line used for the test was 24,000 yards; Hamilton's was 72,482 yards. The test showed, on Black's own figures, exclusive of overcuts, 46,790 yards. The subject is not capable of exact proof, but we are of the opinion that Black's amounts of excavation should be materially increased. Mr. Hamilton's valuation of rock excavation is $4,211,120; Mr. Black's $1,270,-115, of which $1,154,503 is in this account. Applying Black's price to an increased amount indicated by the test results in an increase of this item from $39,432,331 to $40,-232,331.

*Engineering and Superintendence* is stipulated by the parties to be 5 per cent. of the value of the properties excepting accounts Nos. 1316, 1380, 1381, 1382, 1383, 1384, 1385, 1387 and 1388. The parties have stipulated that this and other overheads should not be depreciated. Accordingly we have computed overheads by applying the commission's percentage to the undepreciated values of the property, using $66,425,000.

*Preliminary and Organization Expense.* We adopt the commission's finding of ¾ per cent. of the values of the physical properties; and for *Administration and Legal Expense,* ½ per cent. on physical values including engineering; for *Miscellaneous Construction Expenditures,* 1 per cent., on same values. (Note 2.)

*Interest during Construction.* The commission used a rate of 6 per cent.; the company, 8 per cent. It is customary to calculate this item at the prevailing rate charged a person with good credit for temporary advances, which is now 6 per cent. This throws upon the borrower, the owner of the property, the hazard of the borrowed money during the construction period, which must be considered. Two per cent. is a reasonable allowance for that hazard, but it is customary and preferable to make this allowance as a part of Going Concern Value. The parties have agreed that this item, as well as taxes, should not be depreciated. We have taken the commission's figure, increased by 6 per

cent. on the difference in values found, approximately $200,000.

*Materials and Supplies:* Commission's figure plus its allowance of $119,275 on rehearing.

*Going Concern Value.* Mr. Hamilton's estimate of going concern value is $8,898,532. Ford, Bacon & Davis valued this item from $8,500,000 to $9,000,000. The engineer for the Commission valued it at $3,820,000. The commission allowed $2,000,000. Counsel for the commission urges that nothing be allowed.

That such a value exists is acknowledged by all engineers and appraisers, and is a matter of common knowledge. That allowance therefor cannot be denied because of difficulty in evaluation is settled by decisions of the Supreme Court of the United States and of the Supreme Court of Kansas. Many items enter into it. There is a value to records that have been built up, and to a personnel that has been trained. The period of construction was two years. Physical deterioration went on during that period when there were no earnings to offset it. The owner's money was embarked in a hazardous enterprise during the construction period; the commission allowed only 6 per cent. for interest during construction on the theory that an owner, with good credit, could borrow money at that rate. But the owner should be compensated for the risk involved in putting his credit back of the enterprise. If 8 per cent. is a fair return on moneys embarked in this business, as we elsewhere find, that hazard was present during the construction period. The difference between 6 per cent. interest during construction and an 8 per cent. return in a business venture during construction is $1,450,645, based on the commission's valuation. During the construction period, there are no revenues, and depreciation and return (less interest during construction) must be capitalized in going concern value. After construction is completed, and some business is attached, there is an idle investment until the available business is fully attached, even under the most efficient management. It would be foolish, of course, to construct a pipe line capable only of taking care of the needs of today, with no provision for the reasonably anticipated needs of tomorrow. The commission recognized this in another part of its opinion, when it stated:

"Further, as pipe line extensions were developed, they necessarily were not fully productive until the volume of sales had been built up to the capacity of such extension. A

NOTE 2. We accept the commission's finding, instead of the stipulation of the parties, because the commission's finding is in accord with the record, and there is an acknowledged error in the stipulation.

large proportion of the investment each year was unproductive, although the investment has been included in the plant investment values included in the above, and will be included in the future. This discussion relative to idle plant is merely for the purpose of illustrating that the company has been earning a high return not only on its production property but on its idle and non-productive property."

The commission's theory that rates for the future should be discounted because of the profits of the past is not sound law. Values cannot be increased by capitalizing past losses (Georgia Ry. & Power Co. v. R. R. Comm., 262 U. S. 625, 632, 43 S. Ct., 680, 67 L. Ed. 1144); the corollary that they cannot be decreased by reason of past profits is equally well settled (Board of Pub. Utility Comm'rs v. N. Y. Tel. Co., 271 U. S. 23, 32, 46 S. Ct. 363, 70 L. Ed. 808). Counsel for the commission assumes, contrary to the finding of the commission, that the business existed when the lines were constructed. The towns existed; the distributing companies existed; there was a market for some gas. But, like every other utility, the market had to be and was developed. Vigorous campaigns, in part successful, have been and now are being carried on to develop the market, particularly for house heating and for industrial gas to utilize the surplus in off-peak periods. It is no answer to say that these campaigns are carried on by the distributing companies; no matter who developed the market, the fact is, as testified to by the engineer for the commission, and as found by the commission, a part of the plant was necessarily idle while the market was being developed. The commission's engineer testified:

"I have taken as the best measure of certain items of that going value the company's operating experience, and briefly I have allowed in arriving at this figure used herein, $15,000.00 for the books and records of the company, I have allowed $1,020,000.00 for organization of the operating company, that is the organization of the company, and I have allowed interest and depreciation on idle plant, plant that would be idle during the period this company is acquiring its business, that is between the end of the construction period and the time all business is attached, in the amount of $2,784.645.00, added to the two other amounts of $15,000.00 and $1,020,-000.00, gives $3,819,645.00, which I have applied as $3,820,000.00."

While Mr. Black allowed depreciation and return on idle plant while the company was acquiring its business, in the amount of $2,-784,645, no similar allowance apparently was made during the construction period. The difference between 6 per cent. interest allowed and an 8 per cent. return is $1,450,000. The parties agree on the commission's figure of 2.96 per cent. annual allowance for depreciation. Allowing half of that for the two-year construction period adds approximately $2,-175,000. Without undertaking any precise evaluation of this intangible asset, it is difficult to see how it can be fairly approximated at less than $5,000,000, which is about 6 per cent. of the tangible values, a much lower percentage than the percentage customarily allowed.

*Cost of Financing*, valued by the company at $3,422,512, was disallowed by the commission; we approve, on the authority of Galveston Elec. Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 67 L. Ed. 678, and Denver Union Stock Yard Co. v. United States (D. C. Colo.) 57 F.(2d) 735, 742, and cases there cited.

*Gas Leases.* The company owns the gas rights in about 1,261,000 acres, of which, 42,-297 acres are developed; 196,170 acres are proven; 25,607 are in probable territory; and 998,287 acres are classed as of prospective value only.

Many experienced witnesses, testifying for the plaintiffs, valued these leases at figures, the average of which is $12,914,189, of which $1,996,574 represents the 998,287 prospective acreage. Mr. Holl testified for the commission as to values; he was a practical geologist and oil man with no personal knowledge of the fields in question, and no particular experience with gas leases. His testimony was predicated on a trip he made to the fields for the purpose of testifying, and inquiries made on that trip. He valued the leases at about one-third of the company's value. The commission valued them at $6,-279,237, of which $998,287 was for prospective acreage. The commission valued the Amarillo holdings at $4,281,894; the Hugoton holdings at $556,116. The cost of the leases, after deducting those bought for the Texoma Company, was $5,727,272.

The commission excluded all but 71,267 acres from the rate base. The holdings of the company at Amarillo alone are 94,820 acres. The acreage allowed is valued by the commission at $2,874,390. The commission arrived at this result by finding the amount of gas left in the Amarillo holdings, based upon the estimate of geologists; it deducted from the company's requirements, gas now being purchased by the company from other pro-

ducers; and found that the gas in the acreage allowed would serve the customers for twenty-two years.

The commission found that the remaining leases were acquired for speculative purposes, a finding based upon one fact: the Texoma Company was formed by the Cities Service Gas Company and other interests to build a pipe line to Eastern states; leases were acquired by the Cities Service Gas Company for its affiliate, and later transferred to it. On the other hand, in this court, is the uncontradicted sworn statement of responsible officials that all the acreage was acquired as gas reserves for this pipe line. There is also the significant circumstance that not a single lease, acquired for that purpose, has been sold. We hold, therefore, that these leases were acquired, and are held, in good faith, for this pipe line; and that the finding that they are held for speculative purposes is contrary to all the evidence.

We further find there was error in eliminating these leases from the properties of the company because the company is now contracting some gas, and conserving its own. The first duty of the company is to see to it that its patrons have an adequate supply of gas. To insure this, it must own the gas. Contracts for gas are well enough when gas is plentiful, but when the shortage comes, contracts are not adequate safeguards. Broken contracts will support verdicts for damages, but they will not heat the houses nor cook the breakfasts of the patrons in Kansas. The company has not only the right, but is under the duty, to own enough gas to meet the needs of its customers.

Who shall determine what reserves are adequate? A commission, with no moneys invested, or the owners of this pipe line which, without gas, is worse than useless? Within the limits of reason, undoubtedly that determination must be left with the owners. Perhaps they have been over-cautious, but if error is to be made, it should be on the side of ample reserves. The owners of this property had seen the gas exhausted from field after field; they had seen their customers lost because the supply had failed; they had seen fields of great promise belie their expectations. They had seen geologists wrong before. In recent years, they had seen the state prorate the taking of gas. The commission's figures are predicated on a 20 per cent. recovery; within two weeks of its order, the Texas Railroad Commission cut this to 4 per cent. What the future may hold, by way of state action, no one knows. We cannot say the owners did not, in good faith, acquire this

acreage to protect their great investment and to insure their patrons a dependable gas supply. They invested around $4,500,000 in 200,000 acres in proven or probable territory, and about a million more in a million acres in prospective territory. Upon this five and a half million investment depends the entire value of $75,000,000 of pipe lines and many more millions in the properties of affiliated distributing companies. The Hugoton field is not now connected with the pipe line; but it is a field of great potential supply, is favorably situated, and the investment therein is not large. We find that all the acreage owned is used and useful in the public service.

The value of it is problematical, as is true of all gas properties. If the Amarillo field stands up, it is probably worth the value placed on it by witnesses for the company; if it stands up, then that field is adequate for the needs of twenty years; it may not stand up, and the company acquired Hugoton and other acreage against that eventuality; if it does not, it is not worth so much. Its value depends upon a future market, and on the actions of state commissions. The overwhelming weight of the competent evidence sustains the valuation of the company, around $12,000,000. That is about twice its cost. For the purpose of this case, and upon the authority of United Fuel Gas Co. v. Railroad Commission, 278 U. S. 300, 320, 49 S. Ct. 150, 73 L. Ed. 390, we have put the gas leases in at cost. The figure is arrived at by subtracting from the cost of all the leases, the cost of those transferred to Texoma, which leaves the cost of those now held.

### XV.

*Equally Efficient Substitute.* The chief engineer for Ford, Bacon & Davis testified that the present cost of a pipe line from the gas fields at Amarillo to the cities served by the Cities Service Gas Company, together with the cost of acquiring adequate gas reserves, would be $91,500,000. That in making this estimate he had assumed that the lines could be constructed as the crow flies, and he did not take into account the actual topography of the country; that the lines were designed as cheaply as could be, and that such a system would not furnish the same quality of service as is now furnished by the present pipe line. Applying the 90 per cent. condition of the present system to the physical properties of this hypothetical substitute would reduce this figure approximately $7,-000,000 (computing $70,000,000 as cost of

depreciable properties in hypothetical line), or a present value of $84,500,000.

## XVI.

The revenues which can reasonably be anticipated from the properties of the Cities Service Gas Company under the present rates are as follows:

| | | |
|---|---:|---:|
| Annual net operating income* | | $8,401,680 |
| Depreciation of physical properties, at agreed figure of 2.96%* | $1,966,180 | |
| Rentals on non-producing leases* | 329,917 | |
| Dry Hole Expense* | 174,747 | |
| Depletion of producing leases (agreed) | 70,509 | 2,541,353 |
| Net available for return or 7.11% | | $5,860,327 |

*Operating Income.* Except for two items hereafter noticed, operating expenses are not questioned. The record discloses operating income for the two years ending June 30, 1931, and June 30, 1932; and also for the year ending December 30, 1930, but this year involves a six months overlap into the June 30, 1931, year, with no way to apportion it. We have accordingly taken the two separate years shown. The income for 1932 was $880,000 short of 1931. We agree with the commission that 1932 should not be taken as a test year, for it marks, it is hoped, the low of the depression through which we are passing. The 1932 figure of $7,861,516 includes an item of $52,297.13 paid under the 1¾ per cent. contract, which the commission disallowed. It also includes an item of $50,000, being a portion of rate case expense of $250,000, amortized to that year. The commission taxed $66,936.08 as costs to the respondents. The commission, not challenging the amount, deducted it as a nonrecurring expense. But the court records show that rate cases constantly recur. The city-gate rate for gas, serving the cities involved in this case, has been almost constantly in court for nearly twenty years. Extraordinary rate expenses should be amortized and allowed for the reasons set out in Denver Union Stock Yard Co. v. United States (D. C. Colo.) 57 F.(2d) 735. The $50,000 calculated in but one of the test years is an estimate that $25,000 a year of such expense may be expected. We have averaged the two years shown (adding the 1¾ per cent. payment to each year) and adopted $8,401,680 as the anticipated revenues for the future.

The commission still further increased this, by assuming that the income of 1931 was earned upon a lesser investment in the properties; accordingly, the commission deducted from its value as of September 1, 1931, net additions to capital as disclosed by the company books from January 1, 1930, to September 1, 1931. But this is shown to be inaccurate, because additions were not charged to capital until long after the addition was in service; a lag of from one to three years was customary, in order to close up all claims growing out of a particular job. During 1931 there was almost no construction; there was some during 1930, but part of that was to replace existing facilities. There is evidence that there were not to exceed $2,000,000 additions to plant in the test period; and this would be more than offset in the decline of values between 1930 and the date of the valuation. The properties upon which a return is allowable are those actually in public service at the time of the valuation, and not an average of values theretofore existing. Income for the past, used as a guide for the future, should be figured against property in service when the income was earned; but the facts are, without contradiction, opposed to the commission's assumption in this regard.

To this income the commission added a sum for construction credit which it is now stipulated is in error; and also an item of $23,310 for income tax accruals in the calendar year 1930, the origin of which is not clear. Income tax is an operating expense. Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 67 L. Ed. 678. This appears to be an excess accrual over the amount finally determined to be owing for the year; if so, it means the operating expenses for the year are too high; but the record does not show whether it is already deducted in arriving at the stipulated "net income." If it was not deducted, the stipulated figure is not "net income," as it says it is. The item is not of particular significance; only half of it is applicable to the last six months of 1931; and averaging that with 1932 reduces the item to about $5,000; we have assumed the stipulation speaks the fact, and have dropped it out.

Addition was also made because of payments on account of the 1¾ per cent. contract on gas sold to others than the plaintiffs. Part of this expense is justifiable, particularly since the Cities Service Gas Company has no such agreement as the distributing companies have with the Gas Service Company. But the justifiable amount is not proven, and we accordingly add this payment to the operating income of each of the two years.

*Depreciation Allowance.* The commission found the weighted average per cent. for depreciation of physical properties to be 2.96 per cent. This percentage should be applied to the undepreciated values of the physical

810

properties for the reasons set out in State v. Southwestern Bell Tel. Co., 115 Kan. 236, 292, 223 P. 771; we have treated as depreciable properties those which the parties stipulated as the base for computing engineering and superintendence, $66,425,000. No allowance is made for overheads which the parties agree should go into the rate base undepreciated, for manifestly no annual allowance is necessary for non-depreciable properties. In so doing, we express no opinion as to whether the parties applied correct principles in arriving at their agreement.

*Rentals on Non-Producing Leases.* The company claims a general development expense of $532,530.77, which includes rentals on non-producing leases, and scouting and geological expense. The latter items enter into the rate base, and there is no proof that such expense will be necessary in the future to increase the already ample reserve supply of gas. Lease rentals are proper, and the commission allowed rentals on 1,060 acres of nonproducing leases. Having determined that the company properly owns a large reserve, the lease rentals must be allowed.

*Amortization of Non-Producing Leases.* This point can be best illustrated by an example: Assuming a bonus of $1,000 is paid for a lease not yet producing. We have allowed its value in the rate base, and rentals paid thereon as an expense of operation. When it produces, depletion is allowed. The company amortizes the $1,000 over the life of the lease, presumably about five years, because producing leases are of indeterminate life. If a non-producing lease, like a motor car, is a depreciable item, the cost should be amortized. But a non-producing lease is not depreciating, any more than any other real estate, save that it may be surrendered if found to be non-productive. When and if it is surrendered, the cost must then be charged to operations or amortized. But should it be amortized before it is developed or surrendered? The question is very doubtful; there is no clear evidence that the 1930 figure of $314,981.68 is apt to be a necessary expense for 1933, and 1934. Accordingly, with hesitation, we disallow the item.

*Dry Hole Expense.* The commission assumed that one dry hole a year would be all that would be suffered in an orderly development of this vast property. The actual expenditure in the test year was $174,747.74, a sum representing the cost of ten or eleven dry holes. The facts must govern. The company is not needlessly drilling dry holes, and geology has not reached the point where only one dry hole a year can reasonably be anticipated by a company owning nearly a million acres of prospective leases, scattered in three states and many fields.

XVII.

Under the present rates, the Cities Service Gas Company is earning 7.11 per cent. a year upon the present value of its properties.

XVIII.

A return of approximately 8 per cent. upon present values is necessary, under present conditions, to assure confidence in the financial soundness of the Cities Service Gas Company, to maintain its credit, and to enable it to raise money necessary for the discharge of its public duties. Any return substantially lower than that would be confiscatory. United Railways & E. Co. v. West, 280 U. S. 234, 252, 50 S. Ct. 123, 74 L. Ed. 390.

*Rate of Return.* The pipe line company is subject to the hazards attendant upon the production of gas, and its transportation to distant markets. The amount of gas it may take from its own wells, and the price it may charge for its product, is subject to regulation by public authority. It must find a market in a highly competitive field. It competes with coal and fuel oil in household heating and for industrial purposes; the competition of fuel oil is particularly formidable for household heating; improved oil burners are automatic, approved by the National Board of Fire Underwriters for safety, are as clean as gas, and dependable. Electricity has absorbed the household lighting and is making serious inroads on cooking. In short, it must search for and find its gas; transport it hundreds of miles without an hour's interruption; then find and satisfy its customers. The law contemplates that it make no more than a fair return in good times; it should not be forced to take less when times are hard. There is evidence that in years past the profits of the company exceeded 10 per cent. We do not analyze those figures; in rate making, the past must bury its dead; a confiscatory rate cannot be ordered for the future, because an exorbitant profit was made in the past. Georgia Ry. & Power v. R. R. Comm., 262 U. S. 625, 632, 43 S. Ct. 680, 67 L. Ed. 1144. Board of Pub. Utility Commrs. v. N. Y. Tel. Co., 271 U. S. 23, 32, 46 S. Ct. 363, 70 L. Ed. 808.

What is a proper return is a question of fact in which the elements of time and place play an important part. In this part of the Middle West, it is a recognized fact that in normal times, public utilities must promise a return of approximately 8 per cent., if capital

for construction and extensions is to be attracted from other investments. The Kansas statutes recognize 8 per cent. as a minimum return for a waterworks property (section 13—1202, R. S. Kan. 1923) and provide for a recapture of a portion of the earnings over 10 per cent. of gas and electric companies (section 13—1204, Id.). The Kansas Supreme Court has held that earnings from 8 to 9 per cent. on telephone properties are reasonable. State ex rel. v. Southwestern Bell Telephone Co., 115 Kan. 236, 223 P. 771. The witness for the commission testified that 8 per cent. would not be an unreasonable return in normal times, but testified that these times are abnormal, as they are. But if abnormality is considered, the return must be increased, not decreased. In these times, when stock of the best utilities can be purchased on a 9 per cent. basis or better, certainly an 8 per cent. return on this hazardous enterprise is not unreasonable.

## XIX.

The order of the commission would reduce the net revenues of the Cities Service Gas Company by $1,926,145.07. (The amount is stipulated.) Under that order, the return upon the properties dedicated to the public use would be 4.8 per cent., which rate is confiscatory.

## XX.

If the distributing companies are compelled to pay 40 cents per thousand cubic feet for gas at the city gates, and to base their rates to the consumers upon the price fixed as reasonable by the commission, no one of them will have earnings in excess of operating expenses, applicable to depreciation and return.

## XXI.

The distributing companies could not continue their business and pay the Cities Service Gas Company 40 cents per thousand cubic feet, and predicate their rates to the consumers upon 30 cents; the Cities Service Gas Company could not continue its business without the patronage of the distributing companies.

HOPKINS, District Judge (dissenting).

These are suits in equity to enjoin the enforcement of certain orders of the Public Service Commission of Kansas. The questions presented involve the reasonableness of certain contracts between various of the Henry L. Doherty operating corporations.

The facts so far as necessary to this discussion are these:

One of the Doherty companies, the Cities Service Gas Company, conveys from the gas fields and furnishes gas to the local distributing companies at the various city gates at a contract price of 40 cents per thousand cubic feet. Under another contract each of the distributing companies pays to Henry L. Doherty, doing business as Henry L. Doherty & Co., these items—1¾ per cent. of its gross revenues, a per diem, an expense charge for certain specific services, and an engineering fee of 5 per cent. of the cost of construction.

July 2, 1931, the Public Service Commission, upon certain findings therein made, entered an order for a hearing to inquire into the reasonableness of such contracts.

The respondents appeared, and, after a hearing and rehearing the commission, on August 31, 1932, entered an order substantially to the effect "that on and after the 1st day of September, 1932, the distributing companies shall cease to set up on their books as an expense item any payments made to Henry L. Doherty and Co., of the 1¾ per cent. charge and also any payments made for main line town border gas in excess of 30 cents per M. C. F., and should give no consideration to any such payments in fixing a rate for the domestic consumer."

The instant actions were commenced September 19, 1932, to enjoin the enforcement of such order. The bills alleged diversity of citizenship, that the orders were confiscatory of the property of the plaintiffs, impair the obligation of their contracts, deny to them the equal protection of the law, and unconstitutionally interfere with interstate commerce.

The cases were consolidated for trial. Upon the trial here, the same evidence introduced before the commission was received, supplemented by an agreed abstract thereof, an agreed statement of facts, and by stipulation and other evidence. These cases are a sequel to Western Distributing Co. v. Commission, decided by this court in 1931 (58 F. (2d) 241), and affirmed by the Supreme Court February 29, 1932. 285 U. S. 119, 52 S. Ct. 283, 76 L. Ed. 655.

At the threshold of this inquiry we are met by six propositions which must be kept in mind throughout the investigation.

(1) Natural gas is one of the great natural resources. It is discovered, extracted from the earth, transported, and sold to the people of a hundred and twenty-eight cities and towns involved in this inquiry. The plaintiff has secured control of this great resource for which the people must now pay.

(2) That, while the problem in this territory a few years ago was one of finding gas to supply the demand, it is now a question of finding a market for what appears to be an almost inexhaustible supply.

(3) That the Henry L. Doherty organization is perhaps one of the most efficient ever known, engaged in the handling of public utilities and products thereof, for which reason it has good credit and is enabled to borrow necessary funds for its operations at the lowest available rates.

(4) That within the past two and a half or three years utility rates in this territory have perceptibly fallen, and that a return of from 5 to 7 per cent. is now equal to the purchasing power of from 7 to 10 per cent. during the period of prosperity just preceding that time.

(5) That it is a matter of common knowledge that the Doherty organization has been and is selling, and offering to sell, gas to individual consumers in this territory not only for industrial, but for domestic, purposes at rates far below the 30-cent rate fixed by the public service commission to the distributing companies at the city gates.

(6) That, while public utility rates in general throughout this territory have been perceptibly lowered during the last two or three years, the Doherty 40-cent rate at the city gates has remained the same.

The commission contends that the order under inquiry is not subject to the constitutional objections urged by the plaintiffs because it finds only that the contracts are unreasonable and the extent of such unreasonableness. I do not agree with this contention. The order expressly prohibits payments made to Henry L. Doherty & Co. and to the Cities Service Gas Company for gas at the city gates in excess of the 30 cents per thousand cubic feet "in fixing a rate for the domestic consumer," on and after September 1, 1932. The order, in my opinion, would affect the rates charged the domestic consumers, and is in fact a rate-reducing order, and is therefore subject to review.

There is no contention on the part of the commission that it has power to regulate interstate gas rates. However, a state does have the power to regulate the price of gas brought into it and sold directly to the consumer, because "the business of supplying * * * local consumers is a local business, even though the gas be brought from another state." Missouri ex rel. Barrett v. Kansas Natural Gas Co., 265 U. S. 298, 309, 44 S. Ct. 544, 546, 68 L. Ed. 1027; Penn. Gas Co. v. Public Service Comm., 252 U. S. 23, 40 S. Ct. 279, 64 L. Ed. 434; East Ohio Gas Co. v. Tax Commission, 283 U. S. 465, 51 S. Ct. 499, 75 L. Ed. 1171.

In spite of a stipulation between the parties, I do not concur in the view that, if the charge made by the plaintiff at the city gates was reduced to 30 cents, it would result in a reduction of $1,926,000, in its net income. In all human probability a reduction in rates would induce a greater demand for gas. The plaintiff states that other fuel costs have been reduced. For instance, at page 104 of its brief it says: "In 1924 and 1925 many of these distributing companies were acquired by the Cities Service organization and at no time from then until now has there been any failure in service. Natural Gas in this territory does not have as many outages as does electric service which is always taken as the ideal service in the Utility field at which to aim. The best evidence in this improvement in service is shown by the Annual Reports to the Public Service Commission which show the increased annual sales of gas per customer in all of the towns in this territory throughout the last six or seven years, notwithstanding the fact that during this period the cost of competitive fuels was steadily being reduced, coal and oil now selling at prices hitherto unknown."

At page 106 it says (on the question of interest rates) : "No changes in gas rates from 1923 to date have been made except reductions. These distributing companies have not yet recovered from the effects of their experience as isolated companies to an extent whereby they are able to furnish their own financing for extensions and betterments at a reasonable cost. But they have at all times been furnished with whatever money was needed for additions and betterments by the Cities Service Company and they have been charged an interest rate of only 6% for this money."

But the 40-cent gas rate has not been reduced. Nor do I concur that a rate of 8 per cent upon present values of the plaintiff is necessary under present conditions to secure confidence in its financial soundness, or to maintain its credit and enable it to borrow money.

I do not assent to the conclusion that 40 cents per thousand cubic feet at the city gates is a reasonable charge and that to compel the plaintiff to furnish such gas at 30 cents per M. C. F. will result in confiscation of its property.

I concur in the view of the majority that the various Doherty companies are engaged in a common enterprise, and that the principal one, the City Service Company, is through the agencies of the other corporations supplying gas to the local consumers, and is therefore engaged in a local business. The fact is that the Henry L. Doherty organization is one of the most efficient, far-reaching monopolies operating in this country. It has many interlocking corporations. The common stock of the Cities Service Gas Company is owned by the Empire Gas & Fuel Company, the voting stock of which in turn is owned by the Cities Service Company. Henry L. Doherty & Co. is Henry L. Doherty, who owns 35 per cent. of the voting stock of the Cities Service Company and controls its policies. The Cities Service Company, by stock ownership, legally controls the policies of the distributing companies and the Cities Service Gas Company. Henry L. Doherty in fact controls the policies of all the interlocking companies.

Since as far back as 1910 Henry L. Doherty, doing business under the name of Henry L. Doherty & Co., has been completing and building up this organization. It is manned by experienced executives, financial advisors, construction, valuation, electrical, oil, and gas engineers, geologists, chemists, technical experts, accountants, operators, and lawyers. All are men high in their various professions. Through the years they have learned the Doherty way. They see through the eyes of Mr. Doherty, understand the Doherty language, ("their master's voice") and speak the voice of Mr. Doherty. This is not said in criticism of the Doherty organization, nor of the men high in their professions and avocations, who manage and direct it, but only to illustrate this efficient, powerful, operating machine known as the Doherty organization. With due credit to the poet, Pope, it may be observed:

"That all are parts of one stupendous whole,
 Whose body many corporations are and
 Doherty the soul."

I also concur in the view that, since the Doherty companies exercise a monopoly for supplying gas to the various communities served by the distributing companies, parties herein, and since the Cities Service Gas Company is the unit which procures, conveys, and delivers the gas to the other companies, the only method of determining the fairness and reasonableness of the charge at the city gates is to determine the reasonableness of the return to the Cities Service Gas Company, on its property used and useful in such business.

I further concur in the view that, in determining the facts, the findings of the Public Service Commission are presumed to be correct, Banton v. Belt Line Ry. Corp., 268 U. S. 413, 422, 45 S. Ct. 534, 69 L. Ed. 1020; Cotting v. Kansas City Stock Yards Co., 183 U. S. 79, 22 S. Ct. 30, 46 L. Ed. 92; Denver Union Stock Yard Co. v. United States (D. C. Colo.) 57 F.(2d) 735, 739, and that, on the question of confiscation, the plaintiff is entitled to the independent judgment of a judicial tribunal as to the law and facts, United Railways & E. Co. v. West, 280 U. S. 234, 251, 50 S. Ct. 123, 74 L. Ed. 390; Blue Field W. W. & Imp. Co. v. Public Service Commission, 262 U. S. 679, 689, 43 S. Ct. 675, 67 L. Ed. 1176; Ohio Valley W. Co. v. Ben Avon Borough, 253 U. S. 287, 40 S. Ct. 527, 64 L. Ed. 908; Lincoln Gas & Electric Light Co. v. Lincoln, 223 U. S. 349, 32 S. Ct. 271, 56 L. Ed. 466; Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. Ed. 598.

A contention that the commission is not concerned with the future is not well founded. It is settled that the commission is concerned with rates for the future, and the experience of the past is the only criterion by which it may make rates for the future.

The history of this company shows rapid development since 1926, when taken over by Mr. Doherty, as to investment in plant increase, in sales of gas and in net income. For instance, gas sales in 1927 amounted to $10,771,491; in 1930 $15,380,609, an increase of 42.79 per cent. Investment in plant increased from December, 1927, to December, 1932, 50.23 per cent. During the same period net earnings increased 65.48 per cent. During this period what is known as the Amarillo Wichita Ottawa line was completed, and extensions were made of major importance to Nebraska and Missouri, developing new markets for the business. In 1930 the effect of the depression began to affect sales and earnings of the company largely through loss of industrial business, a business bound to be regained as industrial business improves; and it goes without saying that the carrying of the investment and expense of industrial business should not be placed on the domestic consumers.

Sale of gas for drilling and field purposes during 1932 period were only 36.55 per cent. of such sales during 1930 (showing abnormality during 1932), and it is reasonable to expect that with the return of activity in the

oil and gas business the markets for drilling and field gas will be revived.

Earnings should be averaged over a reasonable period of time in order to determine whether a utility is earning a fair return, or more or less than a fair return, for rate making or any other purposes. Denver Union Stock Yard Case, supra. "The only fair test is to level out the peaks and valleys and estimate the future according to the mean line." Complaint is made that the commission used an average value. The same reasoning which requires the use of average earnings requires the use of average values. It is not fair to compare earnings during 1929 and 1930 with the values in 1931 and 1932, when there were extensive additions to plant investment. The use of average values contemplates the inclusion of values averaged over the same period used for the averaging of earnings.

In connection with the specific questions raised are general questions of public policy. This organization has secured control of a great natural resource for which the people must pay. The question for determination is what charge constitutes the rate base for this plaintiff in arriving at a fair value of its property and what would be a reasonable rate to charge for the product and services rendered to the people. How shall the people of these hundred and twenty-eight cities and towns be permitted to enjoy this natural resource free from extortion and at the same time allow the utility a fair return on the value of its property?

The showing must be clear before the court should interfere with the commission's order. Especially is this true where no actual experience has been had of the practical result of the rates fixed. While there is an alleged prophesied loss of income from a reduced rate, it must not be overlooked that such reduction means probably increased consumption.

In Willcox v. Consolidated Gas Co., 212 U. S. 41, 29 S. Ct. 192, 196, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, it was said:

"Where the rate complained of shows, in any event, a very narrow line of division between possible confiscation and proper regulation, as based upon the value of the property found by the court below, and the division depends upon opinions as to value, which differ considerably among the witnesses, and also upon the results in the future of operating under the rate objected to, so that the material fact of value is left in much doubt, a court of equity ought not to interfere by injunction before a fair trial has been made of continuing the business under that rate, and thus eliminating, as far as is possible, the doubt arising from opinions as opposed to facts. * * *

"There is no particular rate of compensation which must, in all cases and in all parts of the country, be regarded as sufficient for capital invested in business enterprises. Such compensation must depend greatly upon circumstances and locality; among other things, the amount of risk in the business is a most important factor, as well as the locality where the business is conducted, and the rate expected and usually realized there upon investments of a somewhat similar nature with regard to the risk attending them."

F. C. Hamilton and E. B. Black were the principal engineers testifying in this case. Both are eminent in their profession. Mr. Hamilton for many years a member of the Doherty organization, learned in that organization's activities, knowing its business, being interested therein, naturally an efficient and proficient booster of its values when rate matters are involved. All this may be said without in any manner impugning the ability or high character of Mr. Hamilton. It only directs attention to the fact that he has been for many years and is interested in the success of the Doherty organization; that his education and environment have all developed a viewpoint which necessarily is for the benefit of the utility; that he is an interested witness.

Mr. Black is an independent engineer, a member of the old firm of Worley & Black, now Black & Veatch, of high standing and operating for many years, secured by the state for the purposes of this case.

The commission saw and heard the witnesses, painstakingly examined their testimony, and, with the discretion allowed it under the law, arrived at what it determined, the fair and reasonable value of plaintiff's property. And, while it is the duty of this court to make an independent investigation of the facts, which it has done, this court should be careful not to substitute its judgment for that of the commission, unless it is clear that the commission erred.

The effect of the opinion and findings of the majority, if adopted on sufficient of the items, makes a rate base from which it may be argued that the rate allowed the plaintiff is confiscatory. The evidence in my opinion fails to disclose on such items sufficient rea-

sons for setting aside the findings of the commission and substituting those of this court, nor does the evidence justify a finding of this court that a gate rate of 40 cents to the distributing companies is fair and reasonable.

The important questions will be discussed in their order.

### Used and Useful Gas Acreage.

The company owns 1,262,361 acres of gas rights. The commission found that 71,267 acres of such leases were used and useful and devoted to a public use, and valued such acreage at $2,880,390. (Book value.)

Officers of the company testified that they considered all of the 1,262,361 acres of gas rights owned by the company as necessary and a prudent purchase. The majority opinion holds that the Public Service Commission may not substitute its judgment for that of the officers of the companies. True ordinarily, but the rule also is that "what the company is entitled to demand in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public." Pon on Public Utilities, § 591; San Diego Land & Town Co. v. National City, 174 U. S. 739, 19 S. Ct. 804, 43 L. Ed. 1154.

The facts show clearly in my opinion that all of such gas rights are not now used, and that the present consumers do not and will not in the near future receive any benefit from them.

These investments in gas reserves, by the plaintiff, perhaps were prudent, but they should not be used as a base on which to estimate the rate for present consumers. None but the 71,267 acres of leases allowed by the commission are in my opinion used and useful and devoted to the public use.

This 71,267 acres comprises 50,000 acres proven in the Amarillo field with all the wells in that field, and 21,261 acres, all the developed, proven, and probable acreage in Kansas, Oklahoma (except Hugoton), with all the wells in those fields. The recoverable gas reserve in this 71,267 acres is sufficient to furnish all of the company's requirements, excluding the gas purchased under its purchase contracts, on the basis of its requirements for the year 1930, for twenty-two years.

The acreage in the Hugoton field excluded, comprises 123,440 acres. None of the company's acreage in this field is drilled, and all of it is distant at least 90 miles from any pipe line owned by the company. It is held

by the company through ten year leases with about seven years yet to run. These leases require an annual rental be paid and that a well be drilled within the term of the lease. The number of these leases is in excess of 500. The cost of drilling and equipping a well in this field is not less than $20,000, and if the company is to hold these leases it must drill within the next seven years over 500 wells at a cost of over $10,000,000 and in addition pay annual rental in a substantial amount.

The prospective acreage excluded by the commission amounts to 998,287 acres; it is "wildcat" territory. Its value is for oil rather than gas. It is scattered. Very little of it is available to the company's pipe line.

In the assignment of 71,267 acres of leases as used and useful, there are 27,910 acres of land in the Sweet proven area of the Amarillo field, which are not developed, and 1,385 acres in Kansas and Oklahoma, 325 acres of which are proven and 1,060 acres probable, which are yet to be drilled with sufficient reserves of recoverable gas to last for twenty-two years. In addition to this reserve, the company owns purchase contracts entitling it to the gas of 782,421 acres in Kansas and Oklahoma, having 1,502 wells and a daily open flow of 2,138,170 M. C. F.

Gas consumers should not be required to pay a rate for gas based on a return on the valuation of leases which are not used for them, and which, if ever used, will not be until the distant future.

The gas situation, in this territory, has undergone a complete change within the last five years. The Amarillo and Hugoton fields have been developed within that time. Prior to that time the problem was how and where to get gas. Now the problem is to find a market. Utilities then based their rates on the presumption that the gas supply would be exhausted in from seven to ten years. Now the supply appears almost inexhaustible.

Dr. Moore, state geologist of Kansas, testified that the recoverable gas in the Hugoton field alone is sufficient to supply all of the requirements of Kansas, domestic and industrial, at the present rate of consumption, for over one hundred years.

It is a matter of common knowledge that there was recently brought in the "Burton" field within 3 miles of this company's pipe line, with undefined limits, having wells with an open flow of 270,000,000 cubic feet per day, with a rock pressure of 1,200 pounds.

Another matter having a bearing on this controversy is the problem confronting the

Texas Railroad Commission in the Amarillo field as to means of providing a market for the vast amount of "shut in gas"; that is, gas wells which have been drilled by independent operators which are shut in for lack of market.

The first attempt to provide a market for this shut-in gas was by the Common Purchaser Act, which required purchase of this gas by the gas companies. That act was declared unconstitutional, whereupon the Texas commission recently made an order limiting the "take" to 4 per cent. of the potential (open flow). The object of this order appears to be two-fold: First, to conserve the gas in the Sweet proven area in the Amarillo field for domestic and industrial uses; second, to provide a market for this shut-in gas and a ratable taking from all wells. This order is in litigation. Whether or not it may be sustained makes little difference to this plaintiff. It may purchase gas from the shut-in wells, many of which are within two miles of its line, or it may develop its own acreage (50,-000 acres) by drilling additional wells; that is to say, the effect of the Texas order, if sustained, is not to require the company to have additional acreage, but to require additional wells on the acreage which has been allotted to it; or the company, if it prefers, can dispense with its reserves, and in lieu thereof purchase some of the vast quantity of gas available from the "shut in wells," which under present conditions can find no market.

The action of the Kansas commission in including in the rate base only that acreage which presently and will in the near future be used and useful is well supported by the authorities. See United Fuel Gas Company v. R. R. Commission, 278 U. S. 300, page 322, 49 S. Ct. 150, 73 L. Ed. page 401; United Fuel Gas Co. v. Public Service Commission of West Virginia, 278 U. S. 322, 49 S. Ct. 157, 73 L. Ed. 402; City of Erie v. Public Service Commission, 278 Pa. 512, 123 A. 471, P. U. R. 1924D, 89; Logan Gas Company v. Public Utilities Commission of Ohio, 121 Ohio St. 507, 169 N. E. 575.

In my opinion, the commission was well within its powers in finding that 71,267 acres of plaintiffs' gas reserves, which are in addition to its purchase contracts, covering 782,-421 acres and 1,502 wells, with a potential of 1,532,625 M. C. F. per day, are used and useful to the company's developed acreage, 27,910 acres of which is in the Sweet proven gas area of the Amarillo field. The testimony of the officers of the company that they

considered all of the 1,262,361 acres held by it as necessary for its future requirements, is not sufficient to overcome the actual facts, that it has an adequate supply for twenty-two years in the future. It would be contrary to common sense and justice to require the present consumers to pay for gas reserves which are not now used and which might never be used for their needs.

### Going Concern Value.

The facts and circumstances disclosed by the record in this case present a problem different from the ordinary rate case. We have here a producing gas pipe line built for the purpose of supplying already existing customers. Result: Going concern value is very largely opinion based upon theory, when the theory is not supported by the facts.

Mr. Black, testifying for the commission, found the going value to be $3,820,000. Mr. Hamilton, engineer for the Doherty corporations, found it to be $8,898,532. The commission found $2,000,000 as a sufficient allowance for this element of value.

Mr. Hamilton testified: "I just took 10 per cent. of the physical property value for this particular case for that item.

"Q. You have not itemized it? A. No, I have not itemized it in any way.

"Q. As I understand, then you did not arrive at it by finding the cost of attaching this business. A. It is partially the cost of attaching the business, and the time of the engineers and others in negotiating the contracts, but that, for a wholesale situation, is a small item. The largest cost is the excess capacity that you will have for a period of three years, while your distributing companies are getting up to a point where they use the amount of gas that the size of the system is predicated on."

It is apparent from the record that Mr. Hamilton and Mr. Black considered the "idle plant" while the line was reaching the maximum capacity as the largest element of cost to be considered.

Both witnesses testified that the going concern value for a pipe line company would be less than the going value for a distributing plant. Mr. Hamilton testified to the difference between going value for a distributing plant and a pipe line company as follows:

"Q. Do you mean to say, Mr. Hamilton, that every plant of the same value should have the same allowance for going value? A. No, because there would be a different allowance between your pipe-line plant or your

distribution plant or an electric plant or something like that. There might be a wholly different basis.

"Q. For instance you take the distribution plant, take the one here in Topeka, for example—A. Yes sir.

"Q. If you assumed that you would reproduce it now, and it had no customers, it would mean you would have to attach in that case, thousands of customers before the business was established? A. That is true, and 10 per cent. allowance in that distribution plant would not be sufficient in my judgment.

"Q. Then take a pipe-line company like this, and the number of customers you have is not very large, very many involved, don't exceed three or four hundred? A. That is true."

It is perfectly apparent that both witnesses arrived at their calculations for "idle plant" upon a hypothetical basis without considering the actual facts and experiences of the company. It appears that the commission applied the tests which both engineers laid down as a proper measure of determining going concern value, and found that $2,000,-000 was a sufficient and proper allowance. The record shows clearly that on the major part of the pipe line system there was very little idle plant following the construction period.

Many reasons may be advanced as to why a going concern value should be added to the physical value of the property of the distributing companies which does not obtain as to the production and transmission system. This line was built for the definite purpose of supplying customers already secured, and there appears little or no justification for adding a large going concern value to it. It is doubtful if a going concern value amounting to millions of dollars can be established on a theory that expenses are to be incurred after the property has been reproduced, when as a matter of fact such expenses were not incurred. How can it be said that there would be any expense of attaching business to a producing pipe line company which has been built for the sole purpose of supplying already existing customers?

The argument that the cost incident to training personnel is a proper basis of going concern value in this case is not good, because the business of producing, transporting, and distributing gas has been so long in operation that an abundant supply of well-trained personnel is always at the command of the company. In these times there is probably a considerable oversupply.

The commission, in my opinion, was right when it gave consideration to the cost of organizing the operating company, organization legal expenses, cost of records, and some interest, and depreciation on idle plant, taking into consideration that there has been very little, if any, idle plant in the system.

It may be observed in passing that the interest charged on the books of the company to the cost of Wichita-Ottawa 20-inch line amounted to $24,444.01, while Mr. Black allowed for interest on this same line $198,544, and Mr. Hamilton allowed $320,182, indicating that both engineers were not only liberal, but, in fact, made excessive allowances for interest compared with the actual experience of the company. Under all the circumstances the allowance of $2,000,000 made by the commission was reasonable and adequate.

### Rate of Return.

In considering what is a fair rate of return to be earned by the pipe line company in connection with the reasonableness of the gate rate contract of the 40 cents, we must take into consideration what it must earn in the light of its situation, its requirements, and its opportunities. In dealing with its affiliated distributing companies, we should consider the fact that the company should be allowed to earn on the value of its property employed in serving the public with its pipe line, an amount equal to that generally being made by the same business undertakings, which are attended by the same risks and uncertainties. It should also be allowed to earn an amount reasonably sufficient to assure confidence in its financial ability.

There was testimony for the plaintiff that an 8 per cent. return is usual. Other testimony placed the rate at from 6 to 8 per cent. Practically all of the witnesses agreed that some consideration should be given to the fact that this company was not an ordinary public utility company, but one of a large system organized for the purpose of maintaining the credit of the constituent companies and securing financial assistance.

It is apparent from the affiliation and mutual assistance rendered by the great and efficient Doherty organization that this particular plaintiff is and has been able to sell its securities at an interest rate that was from a half to three-fourths per cent. less than anything else that was put out at about that time on a similar project, and that it gets bet-

ter terms on its mortgages. Because of this situation it was able to sell its 5½ per cent. bonds for 96¼. This plaintiff having ample resources does not necessarily have to issue securities now or six months from now or two years from now. "It picks and chooses its time when the markets are right."

The record shows this plaintiff sold $12,-000,000 of first mortgage, pipe line 6 per cent. gold bonds at par. It is apparent, therefore, that it is able to obtain funds at a very low rate and is assured of financial stability and a supported credit which enables it to raise all necessary money for the proper discharge of its duties at a low rate of interest. It is apparent also that there is little risk or hazard in its business. The pipe line system which it has established is a permanent fixture for an indefinite period. It has a gas reserve which insures it of a supply of gas lasting well into the future. The territory which it serves is well protected; it has almost a monopoly on the territory which it serves due to the fact that the distributing units are affiliated companies and it would be economically unsound for another pipe line company to invade its territory.

We are also confronted with changed conditions affecting opportunities for investments which tend to limit the amount of the return. Annual returns upon capital have materially decreased in the past two or three years. Businesses generally are satisfied with a very low rate of return. All businesses, including that of public utilities, are satisfied with a much less rate of return than they were three or four years ago when annual returns upon the capital were unreasonably high.

The Cities Service Gas Company is not an ordinary public utility. It is one of a large system organized for the purpose of maintaining the credit of subsidiary companies and assisting them in their finances. It has been able to extend its business so as to meet increased demands, to pay its operating expenses, including interest on money borrowed, to pay dividends of 8 per cent. upon its capital stock and accumulate a large surplus. See Smith v. Illinois Bell Telephone Co., 282 U. S. 133, 159, 161, 51 S. Ct. 65, 75 L. Ed. 255.

It is apparent from the record that the operations of this plaintiff have been highly successful and enormously profitable. It was organized in 1926, acquiring the assets and assuming liabilities of the following companies: Empire Natural Gas Company, Empire Gas & Pipe Line Company, Kansas-Oklahoma Gas Company, Empire Gas & Fuel Company (gas properties only).

At that time the plant investment of these companies, including uncompleted job orders, was $52,182,525.98. Reserves for depreciation and depletion had been accumulated out of earnings in the amount of $22,423,936.95, or 42.97 per cent. of the plant investment. They had accumulated a surplus amounting to $14,903,660.21, equal to 87.26 per cent. of the total capital stock of the companies taken over.

The combined reserves for depreciation and depletion and surplus amounted to $37,-327,527.16, equal to 218.55 per cent. of all outstanding capital stock of the companies and 71.53 per cent. of the plant investment. They were able to loan other affiliated companies $7,559,571, in addition to paying bond interest and dividends.

When this plaintiff was organized and its books opened, $17,080,000 of capital stock and $2,000,000 of bonds became immediately $25,000,000 of common stock and $25,000,000 of 5½ per cent. bonds; its reserves for depreciation and depletion became $7,760,706 instead of $22,423,939, as they were before the consolidation. No surplus was carried over into the new corporation.

A glance at the financial history of the company since the consolidation in 1926 is of more than passing interest. This history shows that surplus has been accumulated in excess of all interest and dividends paid of $9,044,629 to June 30, 1931; its depreciation and depletion reserves have been increased to $10,818,020. Its total assets have increased from $60,595,001 as of December, 1926, to $109,431,039 as of June 30, 1931. This increase was accomplished with the addition of the outstanding stock and bonds of only $28,365,700 and loans of $9,000,000. The company has been able to advance to affiliated companies $2,677,131. During all this time it paid interest on its bonds and dividends on its capital stock; in 1928 $1,000,-000 dividends, and in 1929 and 1930 $2,000,-000 each on dividends, which is at the rate of 8 per cent. per annum. Its earnings before interest were as follows:

| | |
|---|---|
| 1927 | $5,335,739 |
| 1928 | 6,053,621 |
| 1929 | 8,660,793 |
| 1930 | 8,829,480 |
| Twelve months ending June 30, 1931 | 8,741,809 |

Its net profit, after paying all interest and other charges providing for substantial allowances for depreciation and depletion,

amounted to the following percentages of its outstanding capital stock during each of the years 1927 to 1930, inclusive:

| | | | |
|---|---|---|---|
| 1927 | 9.96% | 1929 | 14.53% |
| 1928 | 6.75% | 1930 | 10.82% |

The plant investment, including uncompleted job orders, increased from $54,243,128, December 31, 1926, to $99,003,996, June 30, 1931, an increase of $45,760,872. A considerable program of expansion was carried out, a large line was constructed from Amarillo to Wichita; a line was extended from near Hutchinson north into Nebraska; lines were extended into Missouri; such construction involved large expenditures which affected the operating expenses of the company.

It is a matter of common knowledge that price levels were higher. The purchasing power of the dollar was very much less than now, 8 per cent. was considered a fair and reasonable rate of return.

Under the present low level of prices, the purchasing power of a return of 6 per cent. is greater than the purchasing power of a return of 8 per cent. was during the periods of higher price levels.

A return of 6 per cent. is not unreasonable at this time. In fact, the great majority of concerns now doing business are glad to earn as much as 6 per cent., and are fortunate to do so. Even a five per cent. return at this time would not be confiscatory.

I am of the opinion that, in view of the financial history of this plaintiff, its highly profitable experience, the fact that it is a part of a large system with its market assured through affiliated distributing companies, its large gas reserves, and all attending circumstances, a return of 6 to 8 per cent. is reasonable, and 5 per cent. would not be confiscatory.

United Railways & Electric Co. v. West, 280 U. S. 234–291, 50 S. Ct. 123, 74 L. Ed. 390, is cited and relied on in the majority opinion as sustaining the conclusion that the rate of return must be 8 per cent. The court in the West Case held that under the circumstances of that case a rate of 6.26 per cent. was insufficient. Three members of the court dissented. In my opinion, the decision in the West Case does not sustain the majority opinion in this case. It was among other things said in the syllabus: "* * * The fair rate of return to which a public utility is entitled is to be tested primarily by present-day conditions, and not by what may have been a proper rate in the past. * * * In determining whether the rates established by a public service commission are so inadequate as to be confiscatory, the court must determine what will constitute a fair return, to the best of its ability, in the exercise of a fair, enlightened, and independent judgment as to both law and facts. * * * A rate producing a return of 6.26 per cent. on the valuation of the property of a street railway company will be considered so inadequate as to amount to a taking of its property without due process, where it is shown that while the total number of passengers carried has for some time steadily decreased, the number carried during rush hours has increased, resulting in an increase of expenses in proportion to the whole number of passengers carried, and that, in borrowing money with which to finance its operations, the company has been obliged to pay a rate of interest ranging well over 7 per cent."

In the opinion it was said (page 250 of 280 U. S., 50 S. Ct. 123, 125, 74 L. Ed. 390):

"A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. * * * A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally. * * * 'Investors take into account the result of past operations, especially in recent years, when determining the terms upon which they will invest in such an undertaking. Low, uncertain or irregular income makes for low prices for the securities of the utility and higher rates of interest to be demanded by investors. The fact that the company may not insist as a matter of constitutional right that past losses be made up by rates to be applied in the present and future tends to weaken credit, and the fact that the utility is protected against being compelled [page 251 of 280 U. S., 50 S. Ct. 123, 74 L. Ed. 390] to serve for confiscatory rates tends to support it. In this case the record shows that the rate of return has been low through a long period up to the time of the inquiry by the commission here involved.' "

On page 251 of 280 U. S., 50 S. Ct. 123, 125, 74 L. Ed. 390, appears the following: "Since 1920 the company has borrowed from time to time some $18,000,000 upon which it

has been obliged to pay an average rate of interest ranging well over 7 per cent. and this has been the experience of street railway lines quite generally. Upon the valuation fixed, with an allowance for depreciation calculated with reference to that valuation, and upon the then prescribed rates, the company for the years 1920 to 1926, both inclusive, obtained a return of little more than 5 per cent. per annum."

On page 252 of 280 U. S., 50 S. Ct. 123, 126, 74 L. Ed. 390, appears the following: "In this view of the matter, a return of 6.26 per cent. is clearly inadequate. In the light of recent decisions of this court and other federal decisions, it is not certain that rates securing a return of 7½ per cent., or even 8 per cent., on the value of the property would not be necessary to avoid confiscation. But this we need not decide, since the company itself sought from the Commission a rate which it appears would produce a return of about 7.44 per cent., at the same time insisting that such return fell short of being adequate."

On page 249 of 280 U. S., 50 S. Ct. 123, 125, 74 L. Ed. 390, appears the following: "What is a fair return within this principle cannot be settled by invoking decisions of this court made years ago based upon conditions radically different from those which prevail to-day. The problem is one to be tested primarily by present-day conditions. Annual returns upon capital and enterprise, like wages of employees, cost of maintenance and related expenses, have materially increased the country over. This is common knowledge. A rate of return upon capital invested in street railway lines and other public utilities which might have been proper a few years ago no longer furnishes a safe criterion either for the present or the future."

The court was there considering a rate for a street railway. It is a matter of common knowledge, to which we may not shut our eyes, that bus transportation and the use of private automobiles the country over have cut deeply into the revenues of street railway companies. The very opposite condition exists in connection with the plaintiff which has made big returns, paid its interest and dividends, accumulated a surplus, loaned money, and is able to float its securities at will and on better terms than other like utilities—a gas pipe line company which practically has a monopoly in its field.

Applying to the instant case the principles stated by Mr. Justice Sutherland in United Railways & Elec. Co. v. West, supra: Considering all the facts shown by the record and attending circumstances, it must ap-

pear beyond question that a rate of return to the plaintiff of from 6 to 8 per cent. on the value of its property used and useful in its business would be a fair return when protected by the state—even a rate of 5 per cent. in these times would not be confiscatory.

In Wabash Valley Electric Co. v. Ralph M. Young et al., 53 S. Ct. 234, 238, 77 L. Ed. ——, a case in which a decision was handed down January 9, 1933, in an opinion by Mr. Justice Sutherland, it was said: "It is true, as appellant points out, that in United Railways [& Elec. Co.] v. West, 280 U. S. 234, 251, 252, 50 S. Ct. 123, 126, 74 L. Ed. 390, this court held that a rate of return for a street railway of less than 7.44 per cent. was confiscatory, saying that sound business management required that, after paying all expenses of operation, etc., 'there should still remain something to be passed to the surplus account'; and that a rate of return which did not admit of that being done was not sufficient to enable a utility to maintain its credit and raise money for the proper discharge of its public duties. Many cases were cited tending to show that a return of 7½ per cent. or even 8 per cent. might be necessary, but it was said (pages 249, 250, of 280 U. S., 50 S. Ct. 123, 125 [74 L. Ed. 390]) that no rule could be laid down which would apply uniformly to all sorts of utilities. 'What may be a fair return for one may be inadequate for another, depending upon circumstances, locality, and risk.' A street railway company, compelled to meet the growing competition of private automobiles, public omnibuses, and other motor carriers, well might sustain such losses of revenue because of the decreased number of passengers carried, as to require a larger rate of return than would be required by an electric utility company like appellant, which not only enjoys a practical monopoly in the field where its services are rendered, but whose financial structure, it fairly may be assumed, is greatly strengthened by its affiliations and by the interested support of the parent company to which it belongs. On the whole we are unable to conclude that a 7 per cent. rate of return, under the facts here disclosed, is so low as to be confiscatory. See Smith v. Illinois Bell Tel. Co., supra, at pages 160–161 of 282 U. S., 51 S. Ct. 65 [75 L. Ed. 255]."

In Kankakee Water Co. v. Gilbert [1] decided by the United States District Court for the Eastern District of Illinois January 6, 1933, it was said "that under existing depressed industrial and financial conditions,

---

[1] No opinion filed.

indicating a greatly abnormal condition both generally and locally, all of which appears in the record, we are not warranted in finding that the probable return of 5.17% upon the valuation as aforesaid, furnished by the commission's prescribed rates, is confiscatory. In this connection, we have considered the evidence of present return in industrial enterprises of other character, and that of similar utility companies, as well as the fact that plaintiff makes no claim and furnishes no evidence that new capital is at present needed in its business."

### The Henry L. Doherty Contract.

The distributing companies pay to Henry L. Doherty 1¾ per cent. of their gross revenue, an engineering fee equal to 5 per cent. of construction, and, in addition, expenses, disbursements, and per diem for Henry L. Doherty & Co. representatives while at the property of the distributing companies or traveling for them on special matters. The distributing companies also pay to the Gas Service Company for the same type of service. The commission allowed payment for the services of the Gas Service Company, but refused approval of payment to the Henry L. Doherty & Co. on the ground that it was a duplication.

What happens is perfectly clear. The distributing companies have similar contracts with two of these other Doherty units for the same class or type of service, one with Henry L. Doherty, the other with the Gas Service Company. The latter furnished the services, the former did not.

The Public Service Commission made an allowance for the services of the Gas Service Company, but denied any allowance to Henry L. Doherty & Co. The majority opinion, while denying payment to Henry L. Doherty & Co. because of failure of proof that services were rendered, holds that the contract is proper. With this I cannot agree.

Application of the rule that a public utility is entitled to charge such rates as will create a sufficient income to provide a fair return upon the value of its property used and useful and devoted to the public does not authorize the owners of a utility to pay themselves increased operating expenses or to provide themselves with unconscionable profit because of their position. Funds for operating expenses are received from the public and to thus duplicate payments for services is unwarranted under any reasonable hypothesis.

The record shows that the activities of Henry L. Doherty & Co. embrace many matters which by the greatest stretch of the imagination could not be a proper operating charge to the distributing companies. These activities are largely devoted to the purchase and sale of Cities Service Securities. Investments of the Cities Service Company and Henry L. Doherty & Co. in oil development and others in no way results in a benefit to the distributing companies. It appears that no securities of the distributing companies have been marketed by Henry L. Doherty & Co., and, should there be, a separate fee would be charged for such services. The production, sale, and transportation of oil and the handling of New York real estate are activities unrelated to the distributing companies, and the consumers of natural gas have no interest in Mr. Doherty's oil or stock business, and should not be compelled to pay the expense of transacting such business. There is no apparent reason why the patrons of these distributing companies should pay to help maintain an office in London. Yet for a period of years the distributing companies have been paying Henry L. Doherty & Co. 1¾ per cent. of their gross revenue from funds received from their patrons.

A number of companies are operated by Henry L. Doherty & Co. at 60 Wall Street, which in no way, so far as the record discloses, contribute to the defraying of the expense of the operation of Henry L. Doherty & Co.

For example: The Gas Securities Company owned by Henry L. Doherty & Co. with offices at 60 Wall Street, with net assets of $23,252,907, and net earnings for 1929 amounting to $1,960,376, was not shown to have paid any revenue to Henry L. Doherty & Co.

The Gas & Electric Securities Company owned and operated by Henry L. Doherty & Co., with offices at 60 Wall Street, has assets of $24,932,188, with an income of $2,086,069 in 1929, with no showing of revenue to Henry L. Doherty & Co.

This Henry L. Doherty contract apparently is for the purpose of keeping Henry L. Doherty informed as to the activities of the distributing companies and the protection of his investment rather than for the benefit of the distributing and pipe line companies. Except to the extent that any specific services may be rendered, there is nothing in the record to show any benefits to the distributing companies from this contract. The benefit is largely for the sole benefit of Mr. Doherty's

holding company, the Cities Service Company.

The activities of Henry L. Doherty & Co. may well be considered a burden to the distributing and pipe line companies, rather than a benefit: First, because they must immediately transfer all their earnings to Henry L. Doherty & Co., leaving them dependent upon it for financial existence for which they must pay, while Henry L. Doherty & Co. has the advantage of these earnings and the use of the funds of the underlying companies pending their distribution as dividends; and, second, because they must pay Henry L. Doherty & Co. 5 per cent. of the cost of their construction projects regardless of the benefit received or the services performed. While this cannot enter into the expense in determining a rate to be charged the consumer, it does affect the financial stability of the distributing and pipe line companies.

Not only did the parties fail to produce any evidence to sustain their rights to such fee as stated in the majority opinion, but they failed in my opinion to justify the need of such a contract.

### Interest during Construction.

Black and Hamilton both calculated interest during construction for the same period. Black allowed a rate of 6 per cent., Hamilton 8 per cent. The question, what is a proper rate?

The plaintiff argues that, "if 8 per cent. is a proper rate of return for the investor to receive after the project is placed in operation, on what theory or by what process of reasoning can the conclusion be reached that this same investor is entitled to less return on his money during the period the plant is being constructed? You have the same investor and the same money going into the same project. Whatever is fair in one case must be fair in the other."

With this contention I do not agree. There is little relation to be found between a rate of interest to be allowed for the use of money borrowed or advanced in construction and a rate of return on the value of property when subsequently put into public service. The latter involves the contingencies of operation and many other considerations.

Interest during construction may be a different rate. It is a fixed allowance, and the hazards which may accompany the earning of a rate after the business is in operation are not present.

The allowance by Black as heretofore said was not only adequate, but excessive. Hamilton's allowance was entirely out of line with the actual facts.

On September 1, 1931, there were properties of the Cities Service Gas Company used and useful in the public service, as follows:

| Number and Title of Account | Reproduction Cost Less Depreciation |
|---|---|
| 1307 Production-rights of way | $ 55,982 |
| 1310 Production-field measuring station structures | 35,909 |
| 1311 Production other structures | 47,876 |
| 1312 Production gas-well construction | 1,294,710 |
| 1313 Production gas-well equipment | 658,439 |
| 1314 Production field-line equipment | 3,126,159 |
| 1315 Production field measuring station equipment | 265,746 |
| 1316 Production drilling and cleaning equipment | 27,908 |
| 1317 Production other equipment | 1,333 |
| 1325 Transmission land | 145,202 |
| 1327 Transmission rights of way | 1,657,530 |
| 1328 Transmission compressing station structures | 1,466,102 |
| 1329 Transmission measuring station structures | 133,310 |
| 1330 Transmission other structures | 113,341 |
| 1331 Transmission compressing station equipment | 8,048,910 |
| 1332 Transmission measuring station equipment | 759,625 |
| 1333 Transmission line equipment | 39,432,331 |
| 1334 Transmission other equipment | 5,633 |
| 1376 General other land | 3,655 |
| 1379 General other structures | 94,687 |
| 1380 General office equipment | 106,035 |
| 1381 General store equipment | 1,805 |
| 1382 General shop equipment | 23,084 |
| 1384 General stable equipment | 568 |
| 1384 General garage equipment | 81,448 |
| 1385 General laboratory equipment | 8,202 |
| 1386 General telephone and telegraph system | 415,070 |
| 1387 General tools and implements | 44,979 |
| 1388 General other equipment | 21,832 |
| | $58,077,111 |
| Preliminary organization expense | 480,008 |
| Engineering and superintendence during construction | 2,881,000 |
| Administration and legal expense during construction | 304,084 |
| Taxes during construction | 875,171 |
| Interest during construction | 3,883,282 |
| Miscellaneous construction expenditures | 608,169 |
| Cost of financing | None |
| Working capital | 775,000 |
| Materials and supplies | 628,675 |
| Going-concern value | 2,000,000 |
| Gas in lines | 22,000 |
| Gas leases | 2,874,390 |
| Rate Base | $73,409,190 |

The following observations may be made with reference to the above accounts: In accounts Nos. 1307 and 1327 the commission arrived at the price of $1.47 per rod by taking actual acreage cost on 31 per cent. of right of way and damage cost shown in the record as being $1.08, plus the agreed 10 cents per rod for expense of abstracting and recording, plus 22 cents per rod for expense of acquisition, plus 7 cents per rod for engineer-

ing, which is at the rate of 5 per cent. There is nothing in the record contrary to the above that warrants the setting aside of the findings of the commission.

Regarding account 1312, it seems to me that the sum of $57,235 deducted by the commission on the legal theory then advanced is not tenable, and that said sum should be restored. Likewise the item of $84,318 should be restored, since the engineer for the commission, for reasons appearing in the evidence, omitted certain items in his calculations which properly belonged therein. I therefore have concluded and found that value of account 1312 should be fixed at $1,294,-710.

In relation to account 1314, it might appear that engineer Black's figure is an estimate based upon an arbitrary figure of 50 per cent. of the depth of main lines for pipe lines, and that Eastman, who testified for the company, was giving evidence from actual size, but a close examination discloses that Eastman's unit prices which he was applying to field lines were not in accordance with the actual depth as shown by inspection, but that, with the exception of field ditches excavated by trench machines, he applied to his calculations of quantities the width and depth of ditches set forth in Exhibit 73, as an average of all underground field pipe lines. I find nothing in the record to warrant setting aside the finding of the commission on this account No. 1314.

Considering accounts 1325 and 1328 and 1331, which, among other properties, dealt with the Hog Shooter property, station, and equipment, account 1325 being as to land owned in fee except general land, account 1328 relates to station structures, and account 1331 relates to station equipment. In this connection it may be said that the argument advanced that between February, 1931, when the company for taxing purposes returned the Hog Shooter property as abandoned, and July, 1931, when the commission ordered the hearing, that the discovery of new gas fields made the Hog Shooter station available, although still not in use during the hearing, does not favorably impress me, and I therefore conclude that $2,000 should have been deducted for the Hog Shooter property in account 1325, making the account valuation $145,202, and that $49,560 should have been deducted for Hog Shooter station structure in account No. 1328, making the account valuation $1,466,102, and that in account 1331 the Hog Shooter equipment in the amount of $414,925 should have been deducted, making the account valuation $8,048,910.

Considering account 1333, the per cent. condition of the property found to be 90.1 per cent. by the commission and the cost of rock excavation as found by the commission and approved by the majority opinion and in that I concur, leaves only the quantities of rock excavated to be considered, and at the threshold of that consideration permit me to state that I agree with the majority that the overcuts should be excluded. In connection with quantities of rock excavated, it should be noted that, since the hearing by the commission, and before the trial by this court, certain inspections were made on one line, and the result of such inspection was introduced in evidence at the trial herein. But an examination of that evidence so introduced discloses nothing that will warrant this court in disturbing the finding of the commission in account No. 1333, to wit, $39,432,331.

Considering other valuations, I have discussed fully gas leases valued at $2,874,390 and the going concern value fixed at $2,000,-000.

I concur with the majority that cost of financing should not be included in the rate base.

There remains therefore only the following items, to wit: Preliminary and organization expense, engineering and superintendence during construction, administration, and legal expense during construction, miscellaneous construction expenditures, taxes during construction, and interest during construction.

Elsewhere in this opinion I have approved the principle of averaging the values as well as the earnings during the test period, but it should be noted that the valuations set out in the opinion are not average values. They are values of September 1, 1931. Using the valuation found as of that date, to wit, $73,409,-190, I find that the plaintiff has failed to show that the 30-cent rate fixed by the commission is confiscatory.

Under the 40-cent rate the Cities Service Gas Company is earning 8.96 per cent. a year upon the present value of its properties.

I find that on the valuation of $73,409,-190 and at a rate of 30 cents the return would be 6.41 per cent. If averaged over a period for the calendar year 1930 and the year from June 30, 1930, to June 30, 1931, and the year from June 30, 1931, to June 30, 1932, the return at 30 cents would be 6.849 per cent.

### Industrial Gas—Discrimination.

The record shows that by far the largest part of the product handled by the plaintiff in this territory is "industrial gas," which is sold to individual consumers at an average of about 15 cents per M. C. F., a little more than one-third of the city gate rate to the distributing companies (40 cents). Part of this product actually sold to "Industrial Consumers," and part to "Domestic Consumers." The industrial consumer (ordinarily) is one who uses a continuous supply of the product through the twenty-four hour period, thereby taking the "off peak" load. The domestic consumer is the housewife, office, or mercantile establishment which (ordinarily) uses the supply during the day, but not at night.

The rule is that the price for gas should never be unnecessarily low to some consumers, while high to others. It should always be high enough to avoid loss to the utility. Special rates for a large portion of the company's output can be justified only upon the ground that they contribute to the public advantage. Discrimination in price based solely on amounts consumed by different patrons cannot be justified, and rebates to certain businesses only because they use a large amount of gas is discriminatory.

Unless the lower rate can be justified upon the ground that it contributes to the general public advantage, the company and not the consumer must bear the loss if one occurs through that class of business. Of course, a schedule of rates contrived for the purpose of selling gas in order that industries using it may operate more economically than can be done with other fuels may, under some conditions, furnish sufficient grounds for a differential rate. It should be clear, however, that the rate named is not a losing one, and that it will increase the company's profits. (The burden of showing this is on the utility.) Differentials of this kind afford no justification for a practice which seeks to charge a large consumer a low price and a small consumer a higher price merely because of a difference in size.

All such considerations should be included in the standard schedule in order that all customers, or possible customers having similar conditions, will receive service at similar rates. A company is not justified in transferring any considerable portion of the costs from one class of patrons to another class. Schedules should be arranged so that as near as possible each patron will pay his fair share of the cost. No rate should be established unless it provides some profit; that is, some return over and above the costs of operation.

There can be no possible justification for the company to depart from its published schedule of prices, or to give any advantage, directly or indirectly, to one customer not offered to others enjoying or seeking the company's service under like conditions.

If the so-called industrial business pays a sufficient profit to bear its part of the load, its part of the upkeep of the general investment, a lower rate is allowable, but, as I see it, the burden is upon the utility to show that such service is self-sustaining. In case of loss, the utility should not expect the domestic consumer to sustain the industrial consumer's part of the investment.

In the instant case, the increased use of industrial gas has not been manifest in any reduction to the domestic consumer. The plaintiff has insisted, and still insists, on the gate rate charge of 40 cents—so that increased industrial business has not led to reductions.

It appears to be a matter of common knowledge that the distributing companies contract, sell and deliver gas also to some domestic consumers at what appear to be discriminatory rates. They do this apparently on the theory that it is justified in meeting competition with other forms of fuel. This practice of furnishing gas to domestic consumers, such as large mercantile stores and hotels, at rates of from 10 to 17 cents per M. C. F., while charging other individual domestic consumer's rates ranging from 75 cents to a dollar and a half per M. C. F., may amount to unlawful discrimination. This question has not been briefed, and I express no opinion thereon. It is one which might well warrant the conclusion that the Doherty companies are not in court with clean hands, and for that additional reason their prayer for equitable relief should be denied. A utility procures its charter and operates through sufferance of the state. Rates for its product are allowed and approved by the state's regulatory body. In this instance, the Public Service Commission allows and approves local rates to the consumers. The companies involved here having applied for and procured approval of such rates are bound thereby, and for them to follow the practice of disregarding the approved schedule of rates in favoring some consumers above others is contrary to law. See R. S. Kan. 66—107, 66—108, 66—109; Empire Natural Gas Co. v. Thorp, 121 Kan. 116, 245 P. 1058; Kansas-

Electric Power Co. v. Thomas, 123 Kan. 321, 255 P. 33. It should not be tolerated, much less have the approval of this court.

If it be argued that so-called industrial sales are not made at a loss, that there is an actual profit on sales to individual consumers at rates as low as from 10 to 15 cents per M. C. F., it certainly is unreasonable to hold that a rate of 30 cents at the city gates to the distributing companies is confiscatory. The distributing company represents all of the consumers collectively, and the argument that it can dispense gas to one of its patrons at from 10 to 15 cents per M. C. F. at a profit, and that a rate of 30 cents to it at the city gates for all its patrons collectively is confiscatory, does not appeal to my reason. The burden rests upon the utility to show clearly that the rate (30 cents) is confiscatory. This it has failed to do.

In Knoxville v. Knoxville Water Co., 212 U. S. 1, at page 16, 29 S. Ct. 148, 153, 53 L. Ed. 371, Mr. Justice Moody, speaking for the court, said: "If a company of this kind chooses to decline to observe an ordinance of this nature, and prefers rather to go into court with the claim that the ordinance is unconstitutional, it must be prepared to show to the satisfaction of the court that the ordinance would necessarily be so confiscatory in its effect as to violate the Constitution of the United States. In Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932 [14 Ann. Cas. 764], the last word of caution by this court was said (p. 166 [of 209 U. S., 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764]): 'Finally, it is objected that the necessary result of upholding this suit in the circuit court will be to draw to the lower Federal courts a great flood of litigation of this character, where one Federal judge would have it in his power to enjoin proceedings by state officials to enforce the legislative acts of the state, either by criminal or civil actions. To this it may be answered, in the first place, that no injunction ought to be granted unless in a case reasonably free from doubt. We think such rule is, and will be, followed by all the judges of the Federal courts.' The same thought, in effect, was expressed in San Diego Land & Town Co. v. National City, 174 U. S. 739, 754, 19 S. Ct. 804, 810, 43 L. Ed. 1154, 1160: 'Judicial interference should never occur unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use.'"

The parties to this litigation have asked that the case be considered on its merits and a final determination reached. On page 117 of its brief the plaintiff says: "We believe it to be most desirable that this court should examine the facts, as well as the law and give to the people the benefit of its authoritative decision upon the real question at issue."

In accordance with this expressed desire, the writer of this opinion has made an investigation of the facts and the law, and is of the opinion that the plaintiff has failed to show that the orders in question, made by the Public Service Commission of Kansas, are unlawful or confiscatory. In accordance with the desire of the parties, I have prepared and filed full findings of fact and conclusions of law in accordance with the views herein expressed. The bills should be dismissed.

Separate Findings of HOPKINS, District Judge.

Findings of Fact.

I. For a long period of years, more than twenty, Henry L. Doherty, doing business under the name of Henry L. Doherty & Co., has maintained a complete organization for the design, construction, operation, and development of public utilities, and oil and natural gas properties. This organization is composed of experienced executives, financial advisors, construction, valuation, electrical, oil, and gas engineers, geologists, chemists, technicians, experts, accountants, operators, and lawyers. There are approximately 1,667 employees. In this organization Mr. Doherty maintains departments for the purchase, sale, promotion, and transfer of stocks of his various corporations; a foreign oil department; marine and tank car department; an oil production and refining department; a real estate division chiefly concerned with New York real estate and maintains a London office.

II. The parties to this litigation are all units or corporations of the Doherty organization and all have to do in some degree with the production, transportation, and sale of natural gas to consumers of Kansas.

III. On July 2, 1931, an order was entered by the public service commission of Kansas, on its own initiative, directed to the plaintiffs herein except the Cities Service Gas Company, finding that the reasonableness of all contracts with and charges made

to the respondents, by corporations owning the stock of the plaintiffs, and of the contracts between Henry L. Doherty & Co., and respondents should be inquired into; the respondent distributing companies were ordered to show cause why payments made under such contracts, if found to be unreasonable, should not be disallowed as operating expenses. A copy of said order is "Exhibit A" attached to the bills of complaint of the distributing companies.

IV. Pursuant to such order, extensive hearings were held. The properties of the Cities Service Gas Company, situated in five states, were appraised by engineers for both parties and valued by the commission. Findings and conclusions were filed by the commission.

A petition for rehearing was filed, allowed, rehearing had, and the orders entered which are now submitted for review to this court.

V. The citizenship and official position of the parties are as stated in the bills of complaint. There is diversity of citizenship, a substantial federal question in each of the cases, and more than $3,000 in controversy.

VI. The plaintiff distributing companies were engaged in the sale and distribution of natural gas to domestic and industrial consumers of 128 cities and towns in Kansas, procuring their gas from another of the Doherty units, the Cities Service Gas Company. The Cities Service Gas Company through Henry L. Doherty has a practical monopoly on the sale of gas to the distributing companies. The arrangement being that the pipe line company will supply the present needs of the distributing companies at 40 cents per thousand cubic feet delivered to their mains. This 40-cent rate is a private contract between the affiliated Doherty corporations.

VII. Except for qualifying shares, the common stock of the distributing companies is owned by the Gas Service Company, the stock of which in turn is owned by the Cities Service Company. The common stock of the Cities Service Gas Company is owned by the Empire Gas & Fuel Company, the voting stock of which in turn is owned by the Cities Service Company. The Empire Gas & Fuel Company has a preferred stock issue outstanding in the hands of the public. Henry L. Doherty owns 35 per cent of the voting stock of the Cities Service Company. The Cities Service Company, by stock ownership, legally controls the policies of the distributing companies and the pipe line company; and Henry L. Doherty in fact controls the policies of all the corporations including the Cities Service Gas Company. The distributing companies do not deal at arm's length with either the Cities Service Gas Company or Henry L. Doherty.

VIII. The Cities Service Gas Company was organized in 1926. It took over the physical properties of five pipe line companies, having a plant investment account at that time of $52,182,525.98. These pipe line companies served many communities in Oklahoma, Kansas, and Missouri. The companies taken over were integrated, so that the gas could be run from the mains of one system into that of another, and the supply thereby made more dependable and economical. Natural gas had long been used for lighting and cooking in most of these cities and towns.

There are extensive and prolific gas fields at Amarillo, Tex., and Hugoton, Kan. It is a matter of common knowledge these fields are being enlarged and extended so that the supply is dependable, for all uses for a long period of time. The Cities Service Gas Company now has an adequate and dependable supply of gas, available at all times at the city gates. Mr. Doherty through the Cities Service Company acquired the distributing companies in order to meet keen competition.

IX. The distributing companies as units of the Doherty organization have each entered into a contract with the Henry L. Doherty Company which provides for services as follows:

1. Personnel (i. e., experienced executives and operators).
2. Executive service.
3. General accounting services.
4. Statistical service.
5. Purchasing service.
6. Designing and construction engineering.
7. Financial service.
8. Securities department.
9. Valuation.
10. Tax departments.
11. New business department.
12. Technical and research department.

X. The Gas Service Company, another Doherty unit, with offices in Kansas City, Mo., has a contract with the distributing companies similar in many respects to the one above set out in finding number nine. It provides that it furnish services as follows:

1. Furnish all administrative and executive service.

2. Financial aid and advice.

3. Purchasing and warehousing.

4. Engineering and operating supervision.

5. All legal services.

6. All insurance purchasing.

7. All general accounting and reports.

8. Supervision and handling of all tax matters.

9. Handling of all pay rolls.

10. Making of all audits and auditing reports.

11. Make all governmental and regulatory commission reports.

12. Supervision of all new business operations.

13. Make all vouchers and disburse funds.

14. Supervise and direct all public relations work.

15. Do all general and policy advertising.

16. Make all valuations and rates and handle all matters pertaining to rate litigation, and routine matters with regulatory bodies.

17. Make and follow up all construction and financial budget.

The commission found that the amounts paid by the distributing companies under this contract with the Gas Service Company were not unreasonable, but refused to approve payments on the contracts set out in finding 9, because of duplication.

XI. The activities of Henry L. Doherty & Co. embrace many matters not covered by the 1¾ per cent. contract, the expense of which is not a proper operating charge of the distributing companies. These activities are: The promotion, sale, and transfer of securities of the Cities Service Company and its affiliates. No securities of the distributing companies have been marketed by Henry L. Doherty & Co., and if they are, the contract provides for a separate fee for such services. The production, sale, and transportation of oil, and the handling of New York real estate, are unrelated activities. The record discloses no reason for these distributing companies maintaining a London office. The consumers of natural gas have no interest in Mr. Doherty's oil or stock business, and his private businesses ought not to be thrown together with the business of serving the public, the expenses of all hopelessly intermingled.

On September 1, 1931, there were properties of the City Service Gas Company used and useful in the public service, as follows:

| Number and Title of Account | Reproduction Cost Less Depreciation |
|---|---|
| 1307 Production rights of way | $ 55,982 |
| 1310 Production field measuring station structures | 35,909 |
| 1311 Production other structures | 47,876 |
| 1312 Production gas-well construction | 1,294,710 |
| 1313 Production gas-well equipment | 658,439 |
| 1314 Production field-line equipment | 3,126,159 |
| 1315 Production field measuring-station equipment | 265,746 |
| 1316 Production drilling and cleaning equipment | 27,908 |
| 1317 Production other equipment | 1,333 |
| 1325 Transmission land | 145,202 |
| 1327 Transmission rights of way | 1,657,530 |
| 1328 Transmission compressing station structures | 1,466,102 |
| 1329 Transmission measuring station structures | 133,310 |
| 1330 Transmission other structures | 113,341 |
| 1331 Transmission compressing station equipment | 8,048,910 |
| 1332 Transmission measuring station equipment | 759,625 |
| 1333 Transmission line equipment | 39,432,331 |
| 1334 Transmission other equipment | 5,633 |
| 1376 General other land | 3,655 |
| 1379 General other structures | 94,687 |
| 1380 General office equipment | 106,035 |
| 1381 General store equipment | 1,805 |
| 1382 General shop equipment | 23,084 |
| 1383 General stable equipment | 568 |
| 1384 General garage equipment | 81,448 |
| 1385 General laboratory equipment | 8,202 |
| 1386 General telephone and telegraph system | 415,070 |
| 1387 General tools and implements | 44,979 |
| 1388 General other equipment | 21,832 |
| | $58,077,111 |
| Preliminary organization expense | 480,003 |
| Engineering and superintendence during construction | 2,881,000 |
| Administration and legal expense during construction | 304,084 |
| Taxes during construction | 875,171 |
| Interest during construction | 3,883,282 |
| Miscellaneous construction expenditures | 608,169 |
| Cost of financing | None |
| Working capital | 775,000 |
| Materials and supplies | 628,675 |
| Going-concern value | 2,000,000 |
| Gas leases | 2,874,390 |
| Rate base | $73,409,190 |

The following observations may be made with reference to the above accounts: In accounts Nos. 1307 and 1327, the commission arrived at the price of $1.47 per rod by taking actual acreage cost on 31 per cent. of right of way and damage cost shown in the record as being $1.08 plus agreed 10 cents per rod for expense of abstracting and recording, plus 22 cents per rod for expense of acquisition, plus 7 cents per rod for engineering, which is at the rate of 5 per cent. There is nothing in the record contrary to the above that warrants the setting aside of the findings of the commission.

Regarding account 1312, it seems to me that the sum of $57,235, deducted by the commission on the legal theory there advanced, is not tenable and that said sum

should be restored. Likewise the item of $84,-318 should be restored, since the engineer for the commission for reasons appearing in the evidence omitted certain items in his calculations which properly belonged therein. I therefore have concluded and found that value of account 1312 should be fixed at $1,294,-710.

In relation to account 1314, it might appear that Engineer Black's figure is an estimate based upon an arbitrary figure of 50 per cent. of the depth of main lines for pipe lines and that Eastman, who testified for the company, was giving evidence from actual size, but a close examination discloses that Eastman's unit prices which he was applying to field lines were not in accordance with the actual depth as shown by inspection, but that with the exception of field line ditches excavated by trench machines he applied to his calculations of quantities the width and depth of ditches set forth in Exhibit 73, as an average of all underground field pipe lines. I find nothing in the record to warrant setting aside the finding of the commission on this account No. 1314.

Considering accounts 1325 and 1328 and 1331, which, among other properties, dealt with the Hog Shooter property, station, and equipment, account 1325, being as to land owned in fee except general land, account No. 1376, account 1328 relates to station structures, and account 1331 relates to station equipment. In this connection it may be said that the argument advanced that between February, 1931, when the company for taxing purposes returned the Hog Shooter property as abandoned, and July, 1931, when the commission ordered the hearing, that the discovery of new gas fields made the Hog Shooter station available, although still not in use during the hearing, does not favorably impress me, and I therefore conclude that $2,000 should have been deducted for the Hog Shooter property in account 1325, making the account valuation $145,202 and that $49,560 should have been deducted for Hog Shooter station structure in account No. 1328, making the account valuation $1,466,102, and that in account 1331, the Hog Shooter equipment in the amount of $414,925 should have been deducted, making the account valuation $8,048,910.

Considering account 1333, the per cent. condition of the property found to be 90.1 per cent. by the commission and the cost of rock excavation as found by the commission and approved by the majority opinion and in that I concur, leaving only the quantities of rock excavated to be considered, and at the threshold of that consideration permit me to state that I agree with the majority that the overcuts should be excluded. In connection with quantities of rock excavated, it should be noted that since the hearing by the commission and before the trial by this court certain inspections were made on one line and the result of such inspection was introduced in evidence at the trial herein. But an examination of that evidence so introduced discloses nothing that will warrant this court in disturbing the finding of the commission in account No. 1333, to wit, $39,432,331.

Considering other valuations I have discussed fully gas leases valued at $2,874,390 and the going-concern value fixed at $2,-000,000.

I concur with the majority that cost of financing should not be included in the rate base.

There remains therefore only the following items, to wit: Preliminary and organization expense, engineering and superintendence during construction, administration and legal expense during construction, miscellaneous construction expenditures, taxes during construction, and interest during construction.

Elsewhere in this opinion I have approved the principle of averaging the values as well as the earnings during the test period, but it should be noted that the valuations set out in the opinion are not average values. They are values of September 1, 1931. Using the valuation found as of that date, to wit, $73,-409,190, I find that the plaintiff has failed to show that the 30-cent rate fixed by the commission is confiscatory.

Under the 40-cent rate the Cities Service Gas Company is earning 8.96 per cent. a year upon the present value of its properties.

I find that on the valuation of $73,409,190 and at a rate of 30 cents the return would be 6.41 per cent. If averaged over a period for the calendar year 1930 and the year from June 30, 1930, to June 30, 1931, and the year from June 30, 1931, to June 30, 1932, the return of 30 cents would be 6.849 per cent.